

E-filing

Arvind Balu as a Natural Man
PO BOX 1401
OAKLAND, CALIFORNIA 94604

**FILED**

*Acting as Advisory Counsel*
George Holland Sr.
George Holland Jr.
Cochran, Neufeld, Scheck

JUN 1 8 2008

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

ADR

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Case No.: **C08-03014**

Arvind Balu,

            Plaintiff,

      vs.

Lake County, Lake County Sheriff's
Department, Detective Jan Layfield,
Lake County District Attorney, Former
DA Stephen Hedstrom, Former ADA
Rebecca Carol Druckman, Lakeport
Police Department, Officer Erickson,
Lake County Mental Health, California
Board of Corrections, Insp. Ganter,
Lake County Sheriff's Jail Division,
(Sgt. Denton, Sgt. Crouch) Lake County
Probation Department, Contra Costa
County, Contra Costa Crime Laboratory,
(CSI person Kimmel), State of
California, Office of Criminal Justice
Planning, Child Protective
Services, (Supervisor and reporter

**ALLEGATIONS OF FACT:**
**CIVIL COMPLAINT**
Action under 42 USC 1983,
AND 42 USC 1985 should the Court find
that plaintiff is a insular minority
and class that suffers invidious
discrimination;

California Department of Mental
Health, Director of ASH, Dr. Eric
Simon, Berkeley Police Department,
(two unknown agents) Atty. Rommel
B    o    n    d    o    c    ,

Atty. Jai Gohel,  City and County of
San Francisco, San Francisco Police
Department, Detective Moorehouse,
(private actors in government nexus)

                    Defendants

Dated this 11th day of June, 2008

ARVIND BALU ("Balu") Hereby alleges as follows:

Arvind Balu brings this lawsuit because a number of people, listed here as

defendants, maliciously, and through abuse of process,

and through indifference and negligence of their civic duties;

Unconstitutionally sent him to prison for a crime he did commit; a crime that

in fact never occurred.  Absent the Furies of Aeschylus, absent a true

victim, many people acted in conspiracy and some acted alone to arrest and

wrongfully convict Balu in violation of the

United States Constitution; in acts of fraud, and acts of malice,

to destroy evidence, suppress evidence, manufacture evidence, present and

commit perjury, to ultimately hold Balu a prisoner for 8 years, a parolee for 1 year, and as a "sex offender" for an additional year; and the scarlet letter for life.  Others acted to prevent Balu from seeking justice, others tortured Balu, others deprived him of liberty by creating indefinite civil commitments, forcibly medicating him until he could not walk and vomited endlessly, and causing permanent brain damage; attacking him until the arachnoid membrane of his brainstem ruptured and cerebro spinal fluid leaked into the cranio cervical junction (brainstem) of his brain, leaving permanent brain damage.  These events were also made possible by the police in his own community, where he was a scholarship student at UC Berkeley, who began a surveillance project on him "Operation Balu" that eventually resulted in making him a target for law enforcement.  They were also made possible by state policies that encouraged the "vertical prosecution" of statutory rape; encouraging prosecutors to fabricate charges of violence; the zeitgeist of the time was the "sexual predator in-formation" act; the state gave special grants to prosecutors to bring sex cases, and ultimately set the stage for horrific violation of our concept of the United States; what you will see here will likely sicken even the most seasoned of attorneys and judges.  Balu seeks justice and compensation for the damages he suffered from unconstitutional conviction and will continue to suffer for the rest of his life; the harm he saw his loved ones suffer; and special masters/federal jurisdiction for those similarly situated-innocent persons wrongly convicted, without the benefit of DNA: "crimes" that never occurred.

### INTRODUCTION AND SYNOPSIS

Each of the violations pled herein are pled as violations of federal constitutional rights.  It is alleged that each violation had the effect of malicious prosecution, abuse of process; false imprisonment, deprivation of life and liberty, cruel and unusual punishment, torture, and brainwashing, extending the impact of the violations which deprived him of his

constitutional right to be free of slavery absent a constitutionally valid conviction; his right to reproduce; his right to bodily integrity and freedom from chemical intrusions of his body; his right to be free of fear; his right to familial association; and all fundamental rights that are deprived from a person in the course of false detention and false imprisonment. The constitutional rights violated led to violations of fundamental constitutional and human rights. Under the doctrine of Heck v Humphrey, US Supreme Court ruled that if asserting violations of constitutional rights would invalidate the conviction, Habeas Corpus had to be used before 42 USC 1983. Once the conviction is overturned or invalidated, one can seek damages for violation of Constitutional Rights under 42 USC 1983. Violations of Due Process of law have been found in Wolff v McDonnell, and Carey v. Piphus, both Supreme Ct. Cases, to be so fundamental that if actual injury is shown, damages must be awarded. The Ninth Circuit and other Federal Courts have published opinions suggesting that not only do constitutional rights have to have been violated, that those violations must have had a causal effect on the wrongful conviction and false imprisonment, components of a malicious prosecution; but further that the *violations that caused the violations* themselves have been constitutional, civil rights violations. It is not enough that in retrospect plaintiff show that civil rights were violated, but that persons *violated civil rights to cause the violation of civil rights*. That these actions were either random and uncoordinated, without state remedies; (Paratt, Logan) or that they were planned and in conspiracy (Cline); though conspiracy can only be alleged by a visible pattern, the actual state of mind of the violators can't be shown. So to allege a conspiracy that is necessarily a planned event, and is part of a complete abuse of government processes, as alleged here, the plaintiff is unable to allege individual violations under 1983 rather than 1985 unless he is prepared to demonstrate that the actions were uncoordinated and unplanned.

However, malicious prosecution can be a combination of both;  and cases such as Hudson v. Palmer and Paratt that have to do with shakedowns within prisons of legal material and other property, for some malicious purpose, are not actionable in state torts because they are not a pattern of officially sanctioned policy or conduct;  though state torts have civil rights analogues, and takings can be actioned; nonetheless, that federal relief is available in these cases; however, completely random and abusive behavior depriving a person of property, even of legal material that allows access to the court, and the events that take place behind walls in places as wild as prisons are not the same as the deprivation of due process in the taking of liberty by police and prosecutors. Events that occurred in plaintiff's case that led to the conviction and extended and expanded the suffering are in some ways systematic behavior but in other ways as desensitized and uncoordinated acts of evil towards plaintiff as the acts that take place behind walls.  Plaintiff has made arguments under Hudson v. Palmer and Paratt many times in the CDC all the way to the directors level as an exhaustion requirement when his TV, for example was taken by guards.  The state in fact does have a tort remedy if the CDC does not refund the property loss; its called the Board of Control. So the Paratt and Palmer analysis has no factual reality in California; with respect to the

taking of life and liberty by wrongful convictions, the state has a procedure, also linked to the Board of Control, called the Victims Compensation Board, which has severe limits on the compensation allowed, and makes no findings of constitutional violations; in fact it is only available for persons who are later found by the board to have not committed a crime or that the crime never occurred; no finding of a violation of the constitution is required; state torts for false imprisonment are preempted by penal code 4900, the victims compensation law.  Once it is accepted the conviction was "erroneous" for the reasons in t section 4900; it is perhaps accepted that a

fundamental constitutional right has been violated; however, unlike in the federal context, the finding made is only one of innocence, and not of a constitutional violation, or constitutional violations leading to constitutional violations, and findings of innocence to demonstrate actual injury, or findings that guilt has not been proven to demonstrate the presumption of injury..  Thus, equitable state remedies do not exist, and the federal Courts should not use the Paratt or Logan analysis, nor should the Court limit the case or controversies to absolute conspiracies or not, as in Cline, nor should the Court compare the random acts of violence and intrusion behind institutional walls to be similar to the random acts of violations in the free world during the context of a prosecution; the state of mind of correctional employees in a penal or forensic institution is different from the sheriff and prosecutor in the free world and the organizational or coordination features of public actors is unlimited and impossible to define as sanctioned due to the secrecy of the communications of these people, far more secret than in institutions where almost everything is recorded; so it is impossible to allege that the violations herein were all conspired, partly conspired, all individually sanctioned, or all individually random and uncoordinated; it is alleged that they were not *all* any of the above, but the violations fall into the two species 42 USC 1985 and 42 USC 1983, and were officially sanctioned in some ways, and in other ways a complete abuse of government and not entirely the result of a coordinated government policy; ie Anti Semitism.

### *STATEMENT OF INTENT, HISTORY AND PROCEDURAL BACKGROUND*

Balu seeks those that committed criminal violations of his civil rights be held accountable and jailed under the criminal analogues of the civil rights act; he seeks a grand jury indictment for these persons.

On or about September 27, 1997, Balu and his co-defendant Brendan Loftus, were convicted by a jury in Lake County Superior Court, approximately 2 hours north of Berkeley. In December 28, 1998, Balu was sentenced to 20 years in prison. Loftus was released in two years; Balu spent almost eight years behind walls, in level 4 facilities, and then in a virtual prison (high control parole and 290 status)for almost two years after that; Balu faces life long stigma and as of two weeks ago, even absent a record, his neighbors and people on his street, began a community "movement" against him, the second in three years; the first occurred in the Montclair community, this one occurs in Piedmont, even living down the street from his appellate attorney, thinking this was a safe area; both are parts of Oakland California, a large city with a high tolerance for many differences in social backgrounds.

After the trial, Balu joined along with his codefendant in a new trial motion, authored by attorney Dennis Riordan. That motion was denied without findings.   During the investigation of this motion, numerous violations were discovered.   Balu's attorneys, on Direct Appeal, on remand, and on Habeas Corpus, argued much but not all of the material facts of innocence that appear in this lawsuit.   The only findings of fact in this case from the criminal appeal process are the judge committed prejudicial error in withholding diary entries that indicated innocence; the rape and gang rape counts were then dismissed as to both defendants;10/2000 for Loftus (out on bail for a year already)and 5/2001 for Balu, under the law of the case.   Balu was then resentenced while in a hospital for emergency treatment; this sentence was reversed by peremptory mandamus, brought on the basis of judicial prejudice; after another mandamus and petition for review in the Supreme Court the judge was recused on the basis of new law, and at hearing Balu was sentenced to 8 years after forensic testing and numerous new declarations of exculpatory evidence, and the court indicated there "are

facts here that Balu did not commit these crimes." Balu did not have a final

termination until 6/19/06, when after a 5/19/06 reversal of all remaining

counts on Habeas Corpus, by this same judge, the DA dismissed the case under

PC 1385; this is a permanent dismissal. The only finding of fact on Habeas

was that Balu was in fact incompetent to stand trial, mentally not present,

essentially tried in absentia, during his 9/1997 trial. This is a civil

finding from an essentially civil process.  There have been no other findings

of reversible error, or findings on issues of constitutional civil rights

violations by the defendants in this lawsuit, within the law of this case and

the litigation of record.  A Petition for Factual Finding of Innocence was

filed in 6/07; however, in 7/07 a ruling in Tennison v. Superior Court,

Tennison being a wrongly convicted man whose civil rights case has been

before this Court, who is currently employed by the San Francisco Public

Defender alongside Loftus who is employed there as well , the codefendant in

this case; Tennison had been given a Factual Finding of Innocence and

believed it should mandate the Victims Board to issue compensation; however,

in an opinion peppered with racially biased language references, the First

District Court of Appeal, the same Court that released Loftus 6 years before

Balu on charges made by the same person, though Loftus had allegations by two

persons, the Court of Appeal in Tennison stated that  Factual Findings of

Innocence are only available to those who are acquitted or not bound over at

preliminary hearings; an absurd result as a reversed conviction is the same

as not having been tried at all; as the defendant has no control over whether

the prosecutor refiles or retries, this opinion puts the finding of innocence

in the hand of the prosecution rather than a trier of facts.  A limited

exception is made for DNA; in cases which are complete fabrications no DNA

sample can exist.  As a result of this ruling, Balu  withdrew his petition

for Finding of Factual innocence, without prejudice; Balu's lawyer also

withdrew due his blind admiration for the Court of Appeal that Balu sharply

criticized as an anachronistic an perverse vision of society; that Petition for Factual Innocence is attached as an exhibit here.

Balu's life is impossible, even with his case dismissed nearly two years ago. He is unable to return to the previous position he was in.  The University he attended, Cal Berkeley, where he was readmitted, began discriminating against him in every way possible, from altering his exams to refusing him admission to classes, and ultimately intimidating and abusing when he went to discuss how he was *no longer* a campus "sex offender," and ultimately manufactured evidence to expel him from college and brand him a mental case.  The stigma of these cases is so strong and so lifelong that even educational, much less career, opportunities are impacted.  Balu set out to develop federal law to protect persons who had suffered wrongful conviction as being part of a "class of one" for equal protection purposes and for legal definition as an ADA protected disability: after all, if persons with sexual disorders such as paraphilia qualify under the UC Berkeley ADA compliance manuals, surely those falsely accused of such ought to have protections from the social and emotional stigma caused by being labeled a sex predator (referenced in campus records, e mail between GSI's and campus doctors), even having to register as such with the campus police who then inform every female GSI and professor of the threat the student posed.  When this record changed, it was impossible for the even the lawyers, either GSI's or professors, or Deans, to accept the reality of what had happened and they simply decided to abuse Balu and refused to allow to enroll in classes, speak to professors in office hours, see his counselor; they then held hearings in his absence and expelled him from school, now labeling him as crazy even without access to his confidential health records or medical expertise.  Essentially, when people found out Balu's past, ironically in the context where Balu was trying to clear all of his records by sharing the Habeas Corpus dismissal of his case, Berkeley professors and Deans saw to it that he could not pursue his

education. Balu resorted to the Federal Courts and was given opportunity by Hon. Susan Illston in a ruling on his ADA action (number) to amend and refile his complaint; by then the college had retaliated, held hearings without Balu on fabricated allegations of misconduct, without Balu's written response served on every dean and the chancellor; this is an example of the flagrant civil rights abuse that a person who has been wrongly convicted must endure. Even education becomes a challenge; after all our society is based on social acceptance. Balu seeks punitive damages against the UC Regents for the loss of his educational opportunity and the shame he suffered; and Balu demonstrates here why compensation cases are important. Balu can't return to the previous position he was in. Balu faces a lifetime of discrimination because lay people have not read what the federal judiciary has read and are not aware of victims such as Balu; in fact they fear this subject to the extent that they victimize Balu further. The violators in this case have taken Balu's ability to live a normal life and pursue life, liberty and happiness. Without compensation, Balu cannot live a normal life-no one trusts him. Compensation in this case is not only to make reparation for the past, but must take into account the permanent social disability Balu faces. Balu is an intelligent man. His State Hospital Stanford Binet test records his score as 147, with the only question missed "Who was Faust?" It is clear that Balu cannot explore his full potential without compensation: for the reason Professor Scheck explains, that without it no one believes he was a victim, and because even the most liberal learning environments discriminate against him.. In the past three years, he has had to leave two new homes, and now a third. He has been persecuted in California and in Texas, due to information on the internet, even beaten by police, and stories run on TV. Even with a lot of education and the well above average financial resources he has and his family has, he is unable to have a normal life. Even the nicer areas aren't safe; essentially Balu must live on island of sorts. It

is hard to imagine how this situation will change; even with Balu's youthful appearance, he is not accepted in the private workplace or private life. This situation with time will cost an innocent man his role in society and his ability to participate in human life.  The state actors and those in their nexus have not done enough to educate the public about the dirty secret of wrongful conviction. It is for this reasons, that the violation against Balu demand extra ordinary compensation to reconstruct the future that has been stolen from him, and remedy the loss of the past.  Additionally, Balu has been left with life long injuries.

Balu is of Dravidian and Israelite racial background; he is the oldest of his entire race born in the United States.  His father was an atomic project physicist in Mumbai, and his mother from Mumbai as well, came to the U.S. in 1969.  His racial status is insular and unique; he asserts he has been the target of persecution because of the dislike of his racial make up.

Balu also asserts that he his rights have been violated because of allegations of "sexual sadism" and those that fall into the group of persons accused of "sexual sadism," acts defined historically as "satanic sex abuse" and fitting the history of blood libel, are members of a unique class that is viewed with great prejudice and is often the scapegoat for other ills. Persons accused of ritual abuse, or vampirism, fall into a unique class because of the sensationalism and historical background impacting these accusations.  Persons who suffer blood libel are a unique class; Wikipedia:

# Blood libel

## From Wikipedia, the free encyclopedia

**Blood libels** are sensationalized allegations that a person or group engages in <u>human sacrifice,</u> often accompanied by the claim that the <u>blood</u> of victims is used in various <u>rituals</u> and/or acts of <u>cannibalism</u>. The alleged victims are often <u>children</u>.

Some of the best documented cases of blood libel focus upon accusations against Jews, but many other groups have been accused throughout history, including Christians, Cathars, Carthaginians, Knights Templar, witches, Wiccans, Christian heretics, Roma, neopagans, Native Americans, atheists, communists, and satanists.[citation needed]

This evil occurred because police and prosecutors manufactured evidence, destroyed evidence, suppressed evidence, flat out lied incessantly, suborned perjury, committed perjury, brainwashed Balu, persecuted him, held him in unconstitutionally without bail in nightmarish conditions without medical treatment for two months prior to trial, subjected him to mortal fear during his trial, held him without medical treatment during trial, rendering him mentally incompetent, railroading both defendants to the wrongful conviction they sought.  They were motivated by financial and career gain.  Even those sworn to protect his rights and attorneys paid to do so, when facing the power of this malicious prosecution, acquiesced and attempted to sacrifice Balu so Loftus could be acquitted, as a trial tactic: this backfired.  Even Balu's post conviction attorney and investigators simply milked the case; it took ten years to develop the state of the evidence that exists now.  While incarcerated, Balu was subject to deprivations that impacted his ability to access the courts, including torture and sensory deprivation, eventually forced medication and permanent seizure problems, and even an illegal attempt by the state to hospitalize him indefinitely, up to life.

*LAKE COUNTY PROBATION DEPARTMENT; LAKE COUNTY SHERIFF DETECTIVE LAYFIELD: CONSTITUIONAL VIOLATIONS AFTER ARREST AND BEFORE FINDING OF PROBABLE CAUSE*

THE SUPREME COURT IN ALBRIGHT V OLIVER DISCUSSED THAT THE ONLY ABSOLUTE RIGHT
TO BE FREE OF THE IMPOSITION OF CRIMINAL PROCEDURE INVOLVES PROBABALE CAUSE
AND THUS THE DEPROIVATIONS MUST BE CLAIMED UNDER THE FOURTH AMENDMENT; IN
THAT CASE DUE TO THE EXCLUSIONARY RULE.  HOWEVER, ANY FACTOR THAT COULD BE
ALLEGED TO HAVE LED TO A FALSE ARREST AND THE FINDING OF PROBABALE CAUSE,
ALSO KNOWN AS A FALSE DETENTION TORT; SEE WALLACE V KATO ACTIONS ACCRUE UPON
CONVICTION, MAY BE STAYED BUT NOT TOLLED; EXCEPT FOR EQUITABLE TOLLING THAT
OCCURS WHEN A CIRCUIT HAS ALREADY STATED THAT SUCH FALSE ARREST CLAIMS WERE
HECK BARRED AND THE STATUTE TOLLED UNTIL HECK WAS SATISFIED.  IN THE BALU
CASE THE TRIAL AND CONVICTION FOLLOWED WITHIN TWO MONTHS OF THE ORIGINAL
FINDING OF PROABABLE CAUSE; AT THAT POINT UNDER CONTROLLING NINTH CIRCUIT
AUTHORITY A CAUSE OF ACTION AGAINST THE ARREST AND HOLDING ORDER WAS WITHIN
THE STATE STATUTE, BUT BARRED BY HECK AND THUS EQUITABLY TOLLED UNTIL THE
REVERSAL OF CONVICTIONS; THUS WALLACE IS NOT RETROACTIVE, AS THE SIXTH
CIRCUIT FOUND RECENTLY.

THUS BALU BRINGS ALLEGATIONS BASED ON AMENDMENTS ONE THROUGH TEN WITH REGARDS
TO THE ARREST AND PRELIM HEARING FOR UNLAWFUL SEARCH, UNLWFUL INTERROGATION,
UNLAWFUL DETENTION WIHTOUT BAIL; THESE WOULD BE ACTIONS FOR FALSE DETENTION,
RELATED TO FALSE ARREST, BUT INVOLVING BEING HELD WITHOUT BAIL OR PROBABALE
CAUSE, AND THAT THE HEARING DID NOT MEET THE STANDARD OF PROBABALE CASUE, THE
JUDGE FOUND THE ACCUSER "INCREDIBLE" BUT FOUND PROBABALE CAUSE; THIS LUNACY
ACTIONS A CLAIM FOR UNCONSTITUIONAL FINDING OF PROBABLE CAUSE; THE EVENTS
INFLUENCING THAT ARREST AND HEARING MUST BE VIEWED IN LIGHT OF THE
CONSTITUIONAL VIOLATION THAT OCCURS IN THE BINDING ORDER AND HOW THEY
CONTRIBUTE TO THE FALSE ARREST, SEARCH, INTERROGATION, AND BINDING ORDER BY A
JUDGE WITH ABSOLUTE IMMUNITY; THE VIOLATIONS OF THE CONSTITUION THAT OCCURRED
AND LED UP TO THIS ABSURD RESULT OF A COURT FINDING PROBABALE CAUSE AND
STATING HE COULD NOT BELIEVE THE WITNESS ARE THE REASON BALU WAS DENIED BAIL

AND BOUND OVER. THE FRUITS OF THESE VIOALTIONS ALLOWED THE FALSE DETENTION

TO OCCUR; WHETER THE ORIGINAL ARREST MAY HAVE BEEN SIGNED BY A MAGISTRATE;

THE CONTINUED DETENTION OF BALU WITHOUT BAIL AFTER TWO BAIL HEARINGS VIOLATED

THE US CONSTITUION; THE PROBATION DEPARTMENT OF LAKE COUNTY DENIED BAIL IN

VIOLATION OF THE US CONSTITUION; THE RIGHT TO BE FREE OF EXCESSIVE BAIL; THE

UNLAWFUL GENERAL SEARCH, LATER SUPPRESSED, WAS USED TO DENY BAIL, AND TO

FALSELY ESTABLISH STRONG SUSPICION; THE ILLEGAL INTERROGATION WAS USED IN

VIOLATION OF ARIZONA AND MIRANDA LED TO THE FALSE DETENTION AND FINDING OF

PROBABALE CAUSE, (this is a different claim regarding the statement taken

orally than the claims that follow having to do with substantive due process

violations and false imprisonment/malicious prosecution) AND WHATEVER

DETENTION THAT PRECEEDED AND FOLLOWED; AND THE TWO MONTHS ON BAIL WHERE BALU

WAS DEPRIVED OF HIS SANITY AND PEACE OF MIND. THESE EVENTS PRECEDE THE TRIAL

AND CONVICTION AND MUST BE ACTIONED SEPERATELY.


*The heavy weaponry of constitutional litigation is available when substantial injuries occur.*


There exists a substantive due process claim where subjecting Balu to a

criminal prosecution violated the 14th amendment. The trial of an

incompetent violates this clause, as stated in Medina. Also, the plain

language of the 42 USC 1983 statute specifies the availability of action

against those who deprive a person of immunities. Immunities can be seen as

immunity from trial or punishment, due to age, idiocy, or insanity.

Therefore 1983 allows for such a claim by statute; while it is a method for

actioning violations, the plain language states immunities to be actionable;

these immunities have not been stated clearly as constitutional rights, and

therefore the 14th amendment due process clause as it applies to states and

the substantive due process clause; if not equal protection of rights under

that clause. Thus the violation of due process, either procedural or

substantive during trial is actionable if such guarantee would have immunized

and effectively prevented a trial from taking place;  this court has found

that procedural due process violations in the context of prison hearings

(Wolff)  and school suspension hearings (Piphus), both cases this court

(Supreme) mentions in the first paragraphs as Heck, in the same breath as

action for wrongful conviction in this context; those cases clearly allow 42

USC 1983 relief and allow for damages if actual injury is shown.

Thus the constitutional finding of fact as to incompetence after, and during

the trial, and the finding of a constitutional states a claim for 1983

purposes under the due process clause, and it is indeed a right to be free

from criminal PROSECUTION AND PUNISHMENT; indeed if actual injury, in this

case shown by the lack of a guilty verdict, a presumption of innocence and a

petition for factual innocence, based on the facts of innocence shown in the

PRT, the RT:

*Balu alleges the following individuals had official responsibility for*

*assuring Balu's mental competence: the judge, his attorneys, and the ADA.*

The judge may have had absolute immunity, but the attorneys and ADA did not.

Balu alleges here that his attorneys meet the color of law requirement

because their state legal obligation as attorneys to declare a doubt as to

their clients competence was not met; that this obligation was a performance

of a public function as the statutory law obligation under CA pc 1368 is

absolute; they meet the government nexus requirement as this obligation was

shared with the state.  Despite defendant Bondoc privately declaring Balu to

be "crazy" and bringing books like Faulkner "as I lay here dying to Court,"
actually having Balu, a defendant facing 60 years in prison at age 24 seated
behind him in the observer area, rather than at the defense table, a
situation unheard of in the USA, which happened because Balu could not
rationally assist in his defense; Bondoc did not stop the trial and ensure
his clients substantive due process rights were met.  His other attorney, Jai
Gohel, attempted to use up his retainer by offering to buy Balu new underwear
and driving him to Court like a 200 dollar an hour chauffer; during these
rides he would ask "why are you so f—d up" with regard to Balu's mental
state.  After sitting in court as a note-passer and observer for a couple of
days in this immensely serious trial, Gohel's retainer ran out and he
disappeared.  Gohel never defended Balu or did any work on his case; it isw
alleged here that Gohel violated Balu's substantive due process right to be
competent during his trial, by not declaring a doubt as required by state
statute; that he was acting (or failing to act) under color of state law as
this was part of a public function and government nexus as his responsibility
was shared with the state; he was well aware of Balu's serious health
problems, and failed to act; he simply misused client funds and came to pass
notes; he also made comments ridiculing Balu; this man committed an omission
that deprived Balu of constitutional guarantees, when sworn to act under
color of law, pc 1368.

The ADA Druckman deprived Balu of his constitutional right to substantive due
process by failing to carry out her duty under color of law to assure the
trial of an incompetent did not occur.  Balu alleges the ADA intentionally
violated his state law guarantees because it was convenient to try an
incompetent person; she was able to antagonize him constantly by laughing and
jeering at him; at one point told his attorney to "1368" Balu, comment "off
the record," which indicated she was aware of the health condition Balu was

in but was willfully indifferent to it; the ADA was not acting as a prosecutor in her function under section 1368; she does not have absolute immnunity in this area.  She was obligated to act as an officer of the court and not as people's advocate; the obligation to assure the fundamental due process right of mental competence and the absolute immunity from prosecution persons incompetent have is simply not a matter of immunity becase it falls outside the prosecutors role of trying the case, and is in fact an obligation shared with the attorneys for Balu; this shared role under state law to protect all defendants in this substantive due process right is an independent function and obligation to no different than any sworn role; this was an immunity granted to Balu by the US Constitution, and the ADA and the DA did not honor this fundamental right out of malicious prosecution; the facts of this case make it clear why this right was violated; the ADA has an obligation to ensure defendants are mentally present and have the cognitive or sensory capability of appreciating what is happening, and there can be no immunity for the purposeful trial of a person immune from punishment, such as a child or idiot; in this case an insane or incompetent person; these are violations of state statute and thus Balu's right to equal protection of law was violated as well.

*Defendants who Violated Balu's U.S. Federal Constitutional Rights to Substantive Due Process under the 14th Amendment*

*Lake County Sheriff's Department, County of Lake,*
*Jan Layfield, former Sheriff's Detective*
*Contra Costa County Crime Lab*
*CSI Person Kimmel (first name and exact title in files), Contra Costa County Detective Moorehouse (first name in files)*
*San Francisco Police Department*

*City of San Francisco*

*County of San Francisco*

*Former ADA Rebecca Carol Druckman*

*Former DA Stephen Hedstrom*

*Lake County DA*

*Officer John and Jane Doe, Berkeley Police*

*Berkeley Police Department*

*City of Berkeley*

*Child Protective Services-Supervisor*

The discovery of new evidence and declarations not discovered at trial reveal 6 prior false accusations of rape and sexual assault- reported by a fifteen year old.  This wrongful conviction was possible because the above defendants acted individually or conspired to violate Balu's 14th amendment constitutional right to substantive due process in a malicious prosecution and abuse of process.

This was not available at trial due to willful suppression of evidence by the Sheriff Detective and the SF Detective, who was acting in private and public conduct in collusion with the state; they withheld this evidence.

The diary pages, tested later, no result found by ESDT, were purposely destroyed by SFOD and LAKE sheriff; the evidence code presumes the material was favorable to the defense; it was destroyed with dubious explanations, at the direction of SFPD a Lake Sheriff, who both later testified falsely as to where they last saw the diary and whether the diary was a focus (perjury).

1

2    Trial counsel could not find the report that showed the story about the diary

3    was doubted by the police sheriff, and the biased judge in this case called a

4    recess before the witness could be impeached.  That judge is before the

5    judicial performance commission, and has been complained of by Balu twice on

     Mandamus and on petition for review as being biased.

6

7    He has absolute immunity; however this false testimony along with the false

8    testimony of SFPD detective, the victims stepfather, as to where the diary

9    was last seen; and the destruction of the pages in that diary by the witness

10   at the direction of these persons constitutes a violation of Balu's rights to

     have discovered this exculpatory evidence.

11

12   The story the witness gives under examination is impossible as the school

13   counselor confirms she was asked to lie for the witness as to the diary being

14   discovered by accident; the witness thus knows it wasn't read, the witness

15   had no reason to be upset with the diary; the witness also had no inclination

16   to protect Balu, as she testified as described here from the prelim through

17   the trial; if her inclination was to protect, she would not have reported

18   this 9 months later anyways; we know she talked at a drug group meeting, and

     then to a counselor, and then to CPS;

19

20   CPS never turned over exculpatory material, the prosecutor in camera stated

21   there was nothing given to her by them, the CPS later attempted to hide who

22   took the report and who wrote it; the report claims this was a boyfriend,

23   spent a lot of time with, who on one occasion (1) person raped her; this

24   entire sequence, along with raped by one person at a reservoir, is a

     contradiction; as such the witness didn't report this passively via a diary

25   read; therefore no reason to protect Balu, or be "upset" with the diary and

1  destroy it because it was discovered, the explanation later shown untrue by
2  the counselor, and did not say it was because the material upset her- the
3  facts are clear that the it was ordered destroyed by the sheriff, when he
   went to examine it and found a story that wasn't the same; at this
4  when upon further inquiry, in tandem with the SFPD detective, ordered the
5  pages removed before it was turned over to the prosecutor.  The SFPD acted in
6  official off duty capacity to investigate and assist in this investigation;
7  that is shown by the detectives trip to the Concord Police and the Contra
8  Costa Lab, and later the Sheriff in Lake County with stories proven to be
   impossible (tied to the four bedposts- no bedposts on bed.) Evidence shows
9  the Lake Sheriff went to Clayton interested in the Diary that allegedly had a
10 written memoir of this accusation, that a guidance counselor had read (but
11 hadn't) to retrieve the journal; when it was found the journal did not
12 incriminate, but exonerated Balu, end of case; they destroyed the pages and
13 then avoided seizing it as evidence; in an investigation like this that would
14 have been entered into evidence immediately as evidence; the diary was later
15 asked to be fed-exed to the prosecutor at counsels request.  This shows
16 evidence that for one month the evidence was suppressed, then ordered
17 destroyed, and then after Balu's arrest at his lawyers insistence, a diary
   with pages torn out is sent to the court.
18

19 This was knowing frame up. SFPD had knowledge of Balu via an exam cheating
20 attempt that was dismissed at prelim; within days Balu was accused of this
21 event having to do with an SFPD detectives daughter.  The SFPD detective was
22 known to be part of a "goon squad" within the department, according to
23 counsel.  Though Balu cannot at this point prove the SFPD initiated the
24 witnesses interchange with the drug session, Balu alleges here that the
   withholding and suppression of evidence can be proven.
25

The Court has had a case before it: Tennison v. City and County of San

Francisco (CO40574). Somehow this case involves officers from the same gang

task force that framed him; the accuser's stepfather and guardian, defendant

Moorehouse was on that force.  The mentality of that task force or "goon

squad" as it is called is important to note here; defendant Moorehouse is

alleged to have been not only acting as a private citizen in a government

nexus, performing public functions, the joint action test, the state

compulsion test, and the governmental nexus test, he also acted in his

individual and official capacity as a member of the SFPD. He used his rank,

badge, and prestige to conduct investigation and arrange specialized forensic

work outside the jurisdiction of the committing court; this "joint"

participation in framing someone would have been laughed at were the man not

a SFPD Detective that could flash his credentials.  As such, this law

enforcement action was more than a private action, but the official action of

a peace officer carrying that certification and training through the city and

county of San Francisco using the prestige and name of that organization to

accomplish the manufacture of evidence and the destruction of evidence in

this case, and to dictate the prosecution of Balu using this status. Were it

not for this interagency cooperation and professional courtesy, much of this

would have been impossible. Detective Moorehouse appeared in Court many

times, flanked by several San Francisco plainclothes officers.  These

officers were paid by the city and county of San Francisco when they appeared

in Court.  Det. Moorehouse attempted to expand his own personal and

departmental notoriety by framing Balu.  Balu was a suspect in "bold armed

robbery" and even homicides (shooting of Ashkenazi club owner, actually

friend of Balu)- after hiring Levine for an attorney, (in the SF case) Balu

somehow became a suspect in high profile events; showing perhaps a for

detectives to try to "pin" cases on high profile defendants that had former

DA's for attorneys that they enjoy challenging.  It is not only possible but

probable that this attorney knew of Moorehouse; the trial attorney in Balu's case, Bondoc, a defendant here first told Balu after his arrest of the witness's step dad, his position was explained as a "member of a secret goon squad" i.e. "task force." Apparently, Balu had knowingly assaulted a Gank Task Force units Detectives daughter at a Lake summer area, after the witness explained his position to him; that Balu had gone through with some orgy of violence in broad afternoon daylight, and then stayed there for further vacation, and even returned the witnesses suntan lotion to the brother that evening at her condo; that can no longer be verfied as recent investigative reports indicate the brother died in a freak train accident in Europe not long ago. It is clear that SFPD Detective abused his official position by acting as an interagency multi jurisdictional peace officer and organizing the fabrication of evidence in COCO County, where he lives; this is not the forensic lab used by Lake County, this was an action coordinated by this Detective. The Detective sought to gain notoriety for his elite "squad" within the department by broadcasting the "vampire rape" of his "teenage daughter" and the "arrest and conviction" of such; the detective most likely gained respect and special benefits for emotional distress (workers comp) and was able to put word out on the street that he would "do" anyone he pleased, and amongst his colleagues that he had the capability to create any outlandish criminal case he wanted and get away with it; it was probably assumed that this was the result of someone "touching his daughter," and this was what he did in return. The city and county of San Francisco and its Police Department must be held to answer for the pattern of abuses caused by the lack of training in human and constitutional rights; the court has had before other cases implicating this organization; this organization failed to train its personal and created a mentality of lawlessness so strong that its detectives found it acceptable and even rewarding to frame people in the counties they took vacations, for added benefits. This organization has a

disease that has harmed a great deal of innocent people, including but not limited to Balu.  The department fostered a mentality that allowed this kind of behavior, committing perjury in other counties, to be recreational "sport," before doing so, the Detective, like his partners, raises his right hand but makes a bear claw hand sign; this symbol is the code for their organization.  Untold numbers of innocent minority men have been framed by these men of this "task force," before they commit felony perjury on the stand they make this gang sign.  It is a hand with the fingers curled forward as if clawing at someone.  These animals have gotten away with murder and are an out of control group that enjoys engaging in criminal violations of civil rights using police power; they did serious harm to Balu with the tacit approval of the SFPD organization and ultimately the city and county. Balu alleges individual and official capacity liability against this detective for his systematic violations of constitutional rights; this detective conducted an investigation as some kind of roaming multi-jurisdictional peace officer in which he coordinated the manufacture of evidence, the suppression of evidence, and the destruction of evidence, violating Balu's substantive due process rights and violating Balu's fundamental right to freedom.  It is also alleged that this department systematically sanctioned this kind of police conduct in San Francisco, especially in the minority housing project areas, and a special master in needed to review cases where people serving serious time, as Balu was, allege that members of the organization that displays secret hand signs such as this committed coordinated perjury against them on the stand; these policemen were trained in how to lie.  Balu seeks these injunctive remedies as well for those not as fortunate as he that are currently slaves of the legal system; wrongly convicted.

The manufacture of evidence was the coordination of COCO county lab to develop purposefully overexposed photos, several, of "wounds" on the witness- none of the photos have visible scars because they are overexposed. The technician there, Kimmel, was directed by Moorehouse to shoot the photos, and then overexpose them in the chemical bath of their darkroom; this caused a purposeful suppression of exculpatory evidence, namely the absence of scars on the witness; and this was clearly an action of manufacturing evidence, as a Contra Costa County CSI person is not trained to shoot photos of non existent injuries on faith that they "WERE" there, and then overexpose them in the darkroom, not redevelop the negatives, and submit them to a prosecutor in a different county, for the purpose of framing Balu by misleading the public. They actually presented the "physical evidence" of scars that did not exist and could not be seen, claiming they were there but overexposed; this bizarre and ludicrous manufacture of evidence was perpetrated by CSI Kimmel in her individual and official capacity, presenting "evidence" certified by COCO county and its reputation, as a favor to Detective Moorehouse and his stepdaughter; this was framing; the evidence is manufactured in that it attempts suggest these photos were overexposed by accident, but there must be scars underneath; the reputation and prestige of a county CSI lab was banked on to challenge the trier of fact to either believe that the photos were "accidentally overexposed" and if not bleached out would show these knife scars; or be confronted with accepting a Forensics lab would actually submit photos that had no injuries visible and bleach them out to hide that fact. This gamble constitutes the manufacture of evidence and a fraudulent effort to fool the trier into believing physical evidence existed; since this likely succeeded, this was an intentional, willfully indifferent effort to manufacture evidence and a belief about evidence, and suppress material evidence; the photos properly developed show no injuries. Appellate lawyers

obtained the negatives years later; the only scar shown was a faint one on the arm, one which is corroborated by a Kaiser nurse as a suicide attempt. Balu alleges here that the Contra Costa County crime lab, in its official capacity, and the county of Contra Costa, and CSI Kimmel, a technician in her individual capacity, knowingly and intentionally used junk science and malice to manipulate evidence and present manufactured results that banked the reputation of their organization to create a reasonable inference that injuries existed against the difficult to accept reality that they overexposed photos in their darkroom and actually submitted bleached out photos of white flesh to defraud the jury into making them think scars of a knife attack were there.  However incompetent Balu's counsel was in addressing this issue, these are not issue that should arise in the first place; this conduct violated Balu's constitutional right to substantive due process of law; the willful suppression of the actual photo images closes in time to the alleged attack deprived Balu of equal protection of law, as the COCO lab had an neutral third party obligation to objective fairness and to protect the rights of all persons; they willfully altered material evidence out of favoritism to a police detective's daughter who was complaining of "vampire rape," this is alleged to have happened at the direction of Moorehouse, the rogue member of the SFPD mentioned herein.

Framing like this is so unusual that it actually got by the trier and the defense attorneys until post conviction proceedings; these are criminal violations of civil rights that contributed in part or wholly, by presenting a charade of "independent confirmation" of "physical evidence," to the wrongful conviction of Balu; this case was reported nine months later, had no DNA proof, so the certification of CSI technicians that they had photographed physical evidence, since under their training they do not photograph non existent evidence, from COCO county, appearing to be neutral to the prosecution since it is not in Lake County, and submitting this as evidence,

and under there training they are not to submit purposefully vague or misleading evidence of no value, these photographs were banked on by the DA as physical evidence; in fact DA Stephen Hedstrom, now a judge, was quoted in the press claiming this case "had physical evidence."

DA Hedstrom and ADA Druckman are sued here in their individual and official capacity for presenting this manufactured evidence, apparently so clever and intimidating a fraud no one had the courage to debunk it then, as this was part of an investigative role and not the role of an advocate; they contracted this material from a source outside their typical Sheriff's channels that handle forensic work, and therefore they do not have absolute immunity; this was custom made "evidence."

Balu alleges the Lake County Sheriff's Department Detective Jan Layfield violated his 14th amendment right to substantive due process of law by committing a series of wanton and malicious, and just plain indifferent deprivations of the rights afforded to suspects and persons accused of criminal violation s of law.  The Lake County Sheriff's Department is responsible for the violations alleged herein as they have the responsibility for training their personnel in the procedures for preserving evidence, turning over exculpatory evidence, conducting searches and interrogations, testifying truthfully and otherwise protecting the rights of the accused. The County of Lake is ultimately responsible for the conduct of its government agencies.  The Detective participated in the destruction of exculpatory evidence in this case, the diary pages that would have shown Balu to be innocent of the accusations against him; this arrest and prosecution would have never taken place had he not conspired with the SFPD Detective to destroy this exculpatory information. Even if Detective Layfiield acted alone or was merely aware of the destruction of evidence; his awareness of the content and the facts and circumstances surrounding the destruction of

this evidence constitutes a suppression of exculpatory evidence.  Detective

Layfield also conducted an unconstitutional general search of Balu's

residence which resulted in the seizure of material irrelevant to the case

and for the desperate purpose of framing Balu; a Mickey Mouse doll and Robert

Loius Stevenson book titled "Kidnapped" was seized to later accuse Balu in

numerous hearings before the Court of being a "kidnapper" who used the mickey

mouse doll as a "prop" to lure victims; many other absurd arguments were made

for the search and seizure of items not listed on the warrant; the only items

seized from Balu, and to this day still in the Lake County strange locker,

that were on the warrant, are a few pairs of gray underwear made by Calvin

Klein.  During the course of further investigations, the Detective framed

Balu's codefendant for the purpose of eliminating his testimony by reducing

it to "accomplice testimony."  This violated Balu's right to call the only

direct eyewitness that could clear him.  The facts on the record are

intentionally vague as to his codefendant; his name is initially not

mentioned; he is not arrested even after Balu describes who he is, (Balu, in

the context of directing the detective towards the only witness he has at the

scene, gives him the name of Brendan Loftus; Balu has no reason to believe

Loftus has been accused of anything, and the Detective did not tell him; the

original police report does not have his name) and only weeks later at the

urging of Balu's lawyer is Brendan arrested.  Balu alleges that the Detective

never intended to arrest Loftus, and the only reason Loftus is named by a

pseudonym in the report, is for the purpose of framing him to eliminate

Balu's witness.  At Balu's first arraignment, Loftus had still not been

arrested, though he was not a fugitive, and the sheriff had his name,

address, phone number; when Loftus was arrested at the insistence of Bondoc,

no search was performed at his residence; no items were presented at trial.

This man Loftus was framed simply to destroy his credibility as an neutral

eyewitness by making him a "gang rapist."  This action deprives Balu of his

this evidence constitutes a suppression of exculpatory evidence. Detective
Layfield also conducted an unconstitutional general search of Balu's
residence which resulted in the seizure of material irrelevant to the case
and for the desperate purpose of framing Balu; a Mickey Mouse doll and Robert
Loius Stevenson book titled "Kidnapped" was seized to later accuse Balu in
numerous hearings before the Court of being a "kidnapper" who used the mickey
mouse doll as a "prop" to lure victims; many other absurd arguments were made
for the search and seizure of items not listed on the warrant; the only items
seized from Balu, and to this day still in the Lake County strange locker,
that were on the warrant, are a few pairs of gray underwear made by Calvin
Klein. During the course of further investigations, the Detective framed
Balu's codefendant for the purpose of eliminating his testimony by reducing
it to "accomplice testimony." This violated Balu's right to call the only
direct eyewitness that could clear him. The facts on the record are
intentionally vague as to his codefendant; his name is initially not
mentioned; he is not arrested even after Balu describes who he is, (Balu, in
the context of directing the detective towards the only witness he has at the
scene, gives him the name of Brendan Loftus; Balu has no reason to believe
Loftus has been accused of anything, and the Detective did not tell him; the
original police report does not have his name) and only weeks later at the
urging of Balu's lawyer is Brendan arrested. Balu alleges that the Detective
never intended to arrest Loftus, and the only reason Loftus is named by a
pseudonym in the report, is for the purpose of framing him to eliminate
Balu's witness. At Balu's first arraignment, Loftus had still not been
arrested, though he was not a fugitive, and the sheriff had his name,
address, phone number; when Loftus was arrested at the insistence of Bondoc,
no search was performed at his residence; no items were presented at trial.
This man Loftus was framed simply to destroy his credibility as an neutral
eyewitness by making him a "gang rapist." This action deprives Balu of his

right to substantive due process of law, as evidence that could clearly

exonerate him was purposefully tainted and denigrated by this atrocious act

towards Loftus.  Detective Layfield violated Balu's constitutional right to

substantive due process by suppressing numerous and distinct items of

exculpatory value to Balu.  The Detective seized concert tickets and stubs

from Balu's residence, that had been saved along with newsletters from

Koocti; the concert tickets had writing on them; the handwriting was that of

the accuser.  The note written is a heart-shaped symbol, and the words "Call

me" and the room number of the accuser, in the condo directly below, where

she was stating with her Detective stepfather.  This evidence was

intentionally hidden in the files; the Clerks transcripts detail "concert

tickets" not amongst the items seized from Balu, but on and inventory of

totally unrelated prosecution evidence.  The Detective was aware of this

prima facie evidence with handwriting on it, and his it amongst other items.

The newsletters from the resort with Balu's name along with letters

indicating he was on their mailing list, and had voluntarily placed himself

on their mailing list by sending letters months later, were suppressed.  The

resort actually never had Balu's name as he came with a coupon he won from a

radio contest, and did not have to present a name.  The newsletters showed

that Balu had volunteered his name to the resort, and sent letters thanking

them for the vacation, and had asked to be placed on their mailing list to

receive future coupons for concert events.  This was exculpatory evidence.

Detective Layfield planted and manufactured evidence in the process of the

interrogation.  The Detective continued the interview several times despite

Balu's request for an attorney; he accomplished this by a simple

manipulation: as he began to leave the room, if Balu asked a question

unrelated to a statement about the case, but about what would happen next inb

the process.  The Detective used this as an excuse to reopen the

interrogation, calling it a reopening of the interrogation and the waiver of

the fifth amendment. It is a shame that Governor Schwarzenegger vetoed a
bill requiring taping interrogations; this bill was presented by the wrongful
conviction conference Balu is a guest speaker for; Balu was framed because
neither the Lake Sheriff or Berkeley Police Department was obligated to make
an electronic recording of this interview; a constitutional safeguard that
costs nothing. Balu alleges the Lake County, its Sheriff, and its Detective,
along with the Berkeley police department, and John and Jane Doe that were
present, participated in the manufacture of evidence to falsely incriminate
Balu by violating his substantive due process rights and right to be free
from coercive and suggestive custodial interrogation; they "prepped" Balu
with case related information and the facts of the allegations, along with
the details of the search warrant and other facts known only to the police;
fro two hours in an interview room with one way mirrors on the walls, until
the Lake County Detective arrived. They did this to "plant" information in
Balu's mind that only someone with mens rea culpa with be aware of. The
Berkeley Police Department is responsible for training its personnel in the
protection of suspects constitutional rights; they participated in this
arrest, and in this interrogation in violation of the standards the Berkeley
Police Department extends to citizens of Berkeley, and thus violated Balu's
constitutional right to due process of law. By feeding Balu facts about the
case, the Detective was able to frame Balu by claiming he had made
"admissions" and "confession" about the case. The Detective presented the
statement to the Court and the Jury stating Balu had "become agitated and
sweating" and blurted out "I didn't hurt a little girl with a knife" and that
Balu had no way of knowing this information; Balu had stated the police had
talked to him, and the Detective stated that "no police had talked to him."
This was flat perjury, in addition to perjury on the stand,
action of incriminating evidence. When interviews are unregulated and
untapped in this manner, police took it upon themselves to "prep" Balu with

exclusive information that only someone privy to the investigation or with

mens rea culpa would be aware of.  This was done to essentially "plant"

information on Balu, information that could then be framed and exploited to

falsely incriminate Balu in violation of his 14th amendment constitutional

right to due process; the suppression of this evidence that Balu was in fact

coaches prior to the interview is a violation by both the Detective and the

Berkeley Police officers who engaged in this conduct, and their respective

respondent superiors; evidence that Balu had been coached and therefore was

attempting to tell the truth, and not making ad "admission" in the form of

revealing guilty knowledge, was also a violation of Balu's constitutional

right to due process of law. Balu alleges the Lake County Clerk committed

violations of his constitutional right to perfect an appeal by suppressing

the statement from the clerks transcripts; the index lists this document but

it is mysteriously missing; the "redacted" statement contained changes not

limited to Aranda issues, but also evidence the Detective lied as to the

circumstance of the interrogation/interview; he had changed his narrative as

to whether Balu had in fact talked to police before he spoke to him.  Balu

was unable to raise proof of police misconduct on appeal due to this fraud by

the clerks office.  Balu alleges that these facts and circumstances, where

Balu was also handed search warrant material listinbg "sexual sadism" and

"underage females" and "green marble knife" which would lead Balu to have

information about the case, and Balu was coached for two hours as to the

facts of the accusation, the suppression of this reality, (typically

suppression involves evidence that exculpates a defendant from an accusation,

in this case this exculpates the defendant from the lies upon lies the police

manufactured) which the Court of Appeal relied to uphold Balu's wrongful

convictions; that these factual circumstances, shown in the records as all

allegations herein are based, in addition to information and belief, and that

which will develop in the context of litigation, are civil rights violations,

constitutional violations of the rights of substantive due process guaranteed

suspects and fundamental fairness the US Federal Constitution guarantees

Balu alleges here that the events here, where a suspect is interviewed

without an audio or video record, and after he is kept in a room for two

hours before the interview and "briefed" as to the case "off the record" and

outside Miranda by police people that initially appeared guns drawn, and fed

incriminating information not publicly known, for the purpose of drawing

incriminating inferences, when the suspect is in fact telling the truth, and

the Detectives cover up the fact that the suspect has been briefed and

coached, and present such information to the jury (juror interviews in this

case indicate this evidence was highly incriminating) as evidence of

defendant blurting out "admission" in the form of "guilty knowledge" and

describe the defendant as "sweating profusely" and "rocking back and forth"

and becoming "incoherent" to suggest a picture of a defendant that has had

some "mens rea culpa" emotional breakdown; is such an act of fraud and deceit

that attacks the fundamental guarantees of civil rights citizens of our

nation have.  Balu's fundamental constitutional rights were violated, rights

the Lake County Sheriff and the Berkeley Police Department, in their failure

to train and prevent abuses of this outrageous nature, abuses that in whole

or part contribute to extreme injuries that Balu has suffered, demand civil

and criminal violations be found against these persons and entities.  The

actual injuries Balu suffered will be shown here as well; the Court must find

the gravamen of a constitutional violation as relevant to the injury it

caused; injury is not merely an issue for damages, but the reason the law of

land must prevail: to prevent harm such as that the Court will witness here

and these defendants must face responsibility for; jurisprudence in the area

of constitutional litigation is to protect the values of our nation, to

prevent evil, and to punish the violators.

Balu alleges Detective Layfield continued to violate Balu's substantive due process rights under the 14th amendment and was indifferent to Balu's right to any and all exculpatory evidence he came across.  The testimony of the prosecutor in a new trial motion handled by the esteemed Dennis Riordan indicates that she had reviewed documents from the CPS agency in camera and there was nothing of probative value when she reviewed it and that Detective Layfield had been responsible for the documents provided.  She then went on to argue that the document could not be verified, and provided declarations from the CPS Supervisor that the person who took the report actually wrote notes, didn't sign there name, and then passed that to the reporter, Denis Cronin, who then wrote the report; Ken Marsh the supervisor at CPS violated Balu's rights by attempting to portray the report, a standard intake referral form filled out based on a direct phone interview with the accuser, as somehow unverifiable; Balu alleges CPS is responsible for this violation that occurred during post conviction proceedings; it was later determined that Dennis Cronin was the author as signed on the report; the school guidance counselor's report indicates the accuse talked to D. Cronin; the CPS supervisor submitted a false declaration; earlier at trial, Balu had moved for disclosure of this report, the prosecutor had falsely suggested the report needed a court order; in a dialogue with the court, in limine, it was determined that the prosecution could get the report without a court order, as CPS is a state agency; the prosecutor admitted to receiving and reviewing the records, stated there was nothing probative in them; and when Riordan accused her of a Brady violation, she stated Detective Layfield had been responsible for these investigations.  Balu alleges that ADA Druckman acted in an investigative capacity throughout this prosecution as she directed Detective Layfield as her sex crimes investigator; the Detective answered to her and did as she requested, in addition to her DA's investigator Roxson, and therefore does not have absolute immunity for many of the events in this

trial.  The CPS report contained exculpatory evidence, it stated that the accuser had begun by stating "a boyfriend" that she had "spent a lot of time with" on one occasion "raped her."  All of this entry contradicts the story that followed: that a stranger dragged her into a room, had less than 15 minutes of contact with her, and gang-raped her with another person.  This kind of evidence, made by a report to a "neutral" state agency is material that standing alone creates reasonable doubt in a rape case.

It was highly probative material that the Lake County Sheriffs Department, via Detective Layfield, suppressed and withheld from Balu in violation of his substantive due process rights, and contributed to his wrongful conviction. This was malicious and the record indicates the ADA reviewed the CPS material provided by the Detective, found "nothing": and later stated the Detective was the one who provided her the material, when a Brady violation was asserted-she stated it was the Detective that had withheld information if anything; however though previously she stated that she had reviewed everything from CPS (the report cannot be missed; it's a one page document) now she claimed she hadn't seen it, but by indicating the Detective had been responsible for providing the information to her, which as he later testifies regarding another Brady violation, the ADA fails to realize she has on the record admitted to seeing the material and that her Detective who lacks absolute immunity has seen it as well, and his failure to disclose it is a Brady violation as well.  Balu alleges that there is not getting out of this malicious and unconstitutional violation of his rights, no matter what lies the ADA Druckman and Detective Layfield want to tell.  They are cornered like varmint, and must face liability for this violation, which they attempted to prevaricate from at the new trial by attempting to conceal yet admitting to yet another Brady violation.  Balu alleges the Detective Layfield and the Lake County Sheriff violated his constitutional rights to due process of law under the 14 amendment by failing to turn over investigative notes that were

Xeroxed and given to him by an investigator, one not hired by Balu and one

his codefendant claimed they had not hired; somewhat of a mystery man named

Mike Gale, nonetheless a licensed private investigator.  While codefendants

counsel was not obligated to turn over the notes, the Sheriff's Detective

certainly was.  Numerous pages of raw notes were copied, some of which appear

in the Clerks transcripts.  In these notes reference is made to a close

friend of the accuser, Deborah Barton, who testified at the new trial motion

and submitted declarations.  Ms. Barton testified she had not seen any

visible injuries on the accuser, as she claimed, at the gym while both were

wearing shorts immediately after the accuser returned from the trip; she

testified that she had mentioned nothing about an attack, had "met cute

guys," and "had fun," and Ms. Barton also provided information about a priror

false story about being raped at knifepoint made by this accuser in previous

months, a story that the accuser admits to telling and making up.  Ms. Barton

went to testify about the accusers character which she was very familiar with

as the closest friend of the accuser; the mother of Ms. Barton testified that

the accuser had to be banned from their home because she couldn't stop

stealing from them.  This character evidence was not barred by the "rape

shield" law which was found by the appellate court to have been erroneously

applied to the diary entries the trial court at trial suppressed; but

evidence the accuser was dishonest, and not merely unchaste as the diary

entries suggested.  The notes the Detective suppressed indicate this witness

had information of evidentiary value and was probative to the defense, in

addition to several other contacts the defense would benefit from; the Barton

evidence was tested in open court, so there is no doubt as to it substantive

due process value; the notes indicated Barton knew the accuser well, and she

had not spoken about anything happening to her immediately after the trip,

hadn't changed at all (probative because the prosecution claimed the accuser

had suffered a major trauma and her mental state had changed night and day

1   and presented this perjury by Detective Moorehouse as proof of the attack to
2   the jury); Detective Layfield had suppressed information all along that
3   witnesses existed that debunked this completely; the witness Barton also
    visually observed the accusers legs immediately after the trip and observed
4   no injury.  The withholding of these notes from the defense which contained
5   exculpatory evidence and witnesses as valuable and credible as Ms. Barton, an
6   attractive young 15 year with no social problems from a comfortable suburb
7   that was classmate and contemporary of the accuser.  Withholding witnesses
8   like this was a civil rights violation that deprived Balu of his substantive
9   due process rights under the Federal Constitution.  This conduct led was part
10  of the malicious pattern of conduct alleged herein, committed by the
    defendants as described, to frame and wrongly convict an innocent man.
11

12  The violations that take place have to be seen in the context of the actual
13  injury to understand why the constitutional protection we have in the USA are
14  of fundamental importance.  Many people feel that while we should uphold the
15  constitution, it is a matter of technical law that doesn't bear on ultimate
16  issues of right and wrong.  That view is unlearned.  The development of
17  constitutional law in the are of civil rights and their application to the
18  rights of the accused and the criminal trial process is based on the
19  fundamental interest: the innocent are not harmed by the state in this
    unimaginable way; and if they are then significant compensation must occur.
20  In the case of Balu, the damage has been done. Our constitutional law as it
21  existed was ignored by the defendants.  Now they must face justice.  The
22  United States is the leader in human and civil rights; when the system fails
23  as it did here, it must be recorded and a heavy toll assessed to ensure
24  justice is there for the innocents in the future.  Due Process protections
25  such as competency to stand trial are not simply medical treatment orders;
    they are to ensure the innocent are not punished.  In our society, we

consider children, insane persons immune from trial or punishment; and
factually innocent people, while they can be tried, every protection the
Courts have created is to prevent their wrongful conviction.

Since this is a 42 USC 1983 and 42 USAC 1985 action, the Court and Jury will
be reviewing what went wrong here and taking action to prevent these wrongs;
to uphold our constitution in the future, while punishing those who betrayed
our country.  The issue of Balu's innocence is central to the factual
allegations herein and the significance of every constitutional violation can
only be measured by the horror of the result.  Balu therefore alleges the
facts of his innocence to support these claims and the proof that Balu's
fundamental Constitutional right to freedom when innocent was violated as
demonstrated by the following facts which prove to a statistical certainty he
is an innocent man who "haunts our system like a ghost."

*Attached is Factual Innocence Petition, and RT facts in appellate reply brief
and Declarations and False Accusations*

Balu pleads here the attached Petition for Factual Innocence as true.
This petition is on file, permanently on hold without prejudice, because of
the current case law in California, as discussed, that does not allow the
state statutory procedure for this factual finding.  Federal law does not
require this factor in itself to have standing to bring a 42 USC 1983 case;
see Wambaugh v. Smith, 3rd Circuit Court of Appeal, interpreting Heck v
Humphrey, US Supreme Ct.  Balu alleges here that innocence is a critical
factor in this trial and the interpretation of our Constitution and the proof
of actual injury. The Court and Jury can and will try these facts.  Balu
verifies and alleges the facts set forth in the attached pleading as true and
incorporated herein.

Balu alleges the following facts support his claim of actual innocence and actual injury based on the trial records:

*The accuser claimed her hands and feet were tied to the four corners of a bed when raped, in a written statement to a Sheriff's deputy. At trial after being informed and shown photos that the bed had no posts or headboard capable of having anything tied to, she recanted this allegation. When her initial statement was shown to her, she claimed she never made such a statement and the deputy had made this up.*

*This accuser suffered from conditions now called recovered memory syndrome and self mutilation; Balu does not set out to prove the psychological problems this person faced, as she is not being sued her; it is the corrupt defendants that exploited her sickness for personal gain, games, and sport, and purely sadistic satisfaction that must be held responsible.*

*The accuser claimed her shirt had not been removed in her first statement. At a preliminary hearing, she claimed it had been. At trial she claimed it had not been because she refused. Later at trial, on recall, she claimed it had been in the process of a struggle.*

*The accuser testified Balu had been armed with a knife. She then testified she could not remember if it was open or closed (folding blade), or in the attackers left hand or right hand. She testified that the knife had been on a nightstand. She then testified she had only seen it in her attackers hands. Previously at preliminary hearing, she testified she had only seen the knife in the living room, and not in the bedroom.*

She testified she was dragged into a bedroom.  Her friend testified she had walked into the bedroom voluntarily.  She then testified she had been dragged in the second time, and at his time her friend was waving goodbye as this happened; the same friend never called police. That friend testified that Balu's codefendant Loftus had molested her by kissing her neck, and had no reason to defend Balu as she was a prosecution witness.

When this accusation was first made at the drug counseling session, the counselor wrote down her words verbatim, stating the accuser said she had been raped by someone at a reservoir.  At trial, the accuser testified she had never used these words.  The accusations then developed against two men; this accuser was in high school and knew the difference between a water reservoir and a resort where her family was on vacation, and had gone in previous years.

The accuser testified the accusation came up because her counselor has read her diary.  The guidance counselor testified she had never seen a diary, and that the subject of a diary came up when the accuser stated she had lied about this and needed her to lie for her.  The accuser then testified this meeting never occurred and that she never stated anything about this diary in this context.

The accuser testified she had seen both Balu and Loftus in the room , after a blindfold was removed.  In her initial statement she stated she had only seen one person in the room.

The accusers mother testified she had seen only a small shaving nick on the accusers leg, not cuts all over her legs and body; while on this vacation and afterwards.  There were outdoor activities and a watercraft that had sunk while on this trip, discussed at trial. This testimony was fabricated to be

consistent with Detective Moorehouse who struggled with the question of whether he had seen these alleged injuries on this trip, and came up with the story that while in their Suburban, connected to their watercraft, and while reversing the vehicle, he happened to glance at the accusers legs and see this nick.   Apparently no one saw this accuser bleeding all over the place and covered with the several knife wounds she describes while at a summer resort for the two days after this attack was alleged to have happened; this is a lakefront resort where people are wearing bathing suits, shorts, and swimming and boating.   Nor did she say a word for nine months afterwards.

The accuser called Balu for her suntan lotion the same evening after the alleged gang rape, confirmed by her testimony; Balu returned it to her brother at their condo downstairs, where her stepfather was also staying, after the alleged gang rape; investigation in the spring of 2007 indicates this witness died in a freak train accident in Europe.

The above information is recorded in the trial and was presented.   More information was withheld at trial as discussed herein, and information such as documentation in the accusers diary, in hospital records, and from witnesses at the drug counseling session, and her first sexual partner, indicate she lost her virginity nine months after this attack, while using a condom, to a high school classmate; medical records indicate her hymen was intact long after this attack.

Further facts developed in post conviction proceedings are also attached here and alleged as proof of innocence. These include witness Debbie Barton, discussed above in this pleading; witness Lester Garcia, to whom the accuser recanted the story and stated she had made the whole thing up, an admission to perjury; that she had wanted to have sex with Balu but was refused.

*Evidence that she had made not one, but several false accusations of rape and sexual assault in the past; that three separate classmates on three different occasion had raped her, had even impregnated her and would be accused of rape if they did not accept her "twins" were his paternal responsibility- he being Mike DelMonte, declaration attached; he had sex with her prior to this; that Carlos Garcia, the boy who she lost her virginity to, had raped her, separate declaration; that another unknown man dragged her into the woods and cut her shorts open with a knife and attempted to rape her, and that another classmate sexually battered her. Evidence that Loftus was falsely accused must be accepted as law of the case as he was exonerated of all charges by numerous opinions of the Court of Appeal that suggest he was framed.*

*That is five known false accusations of sexual attack by this accuser prior to age 16.  There are no statistics of any person being subject to so much sexual attack in one lifetime by so many people on different occasions by unrelated people; and previously by her uncle (medical interview), such events have occurred only in cult communities, such as the Manson family, in cases of hostages and sex slaves;*

*and in war zones like Serbia, where rape is an act of war and the tanks are painted with images of pornography.*

*We also know these teenage rapes the accuser claims are false allegations, some admitted to as such, others declared as such by her classmates/witnesses,*

*Balu alleges he is innocent and was falsely accused; actual injury defines the constitutional inquiry and the gravity of the violations worthy of trial;*

*This malicious prosecution and abuse of process made nightmare a reality; Balu alleges he need not prove evil design, desire or motive on the part of the defendants, but alleges they are disturbed people and if Balu could*

1   *Evidence that she had made not one, but several false accusations of rape and*

2   *sexual assault in the past; that three separate classmates on three different*

    *occasion had raped her, had even impregnated her and would be accused of rape*

3   *if they did not accept her "twins" were his paternal responsibility- he being*

4   *Mike DelMonte, declaration attached; he had sex with her prior to this; that*

5   *Carlos Garcia, the boy who she lost her virginity to, had raped her, separate*

6   *declaration; that another unknown man dragged her into the woods and cut her*

7   *shorts open with a knife and attempted to rape her, and that another*

8   *classmate sexually battered her. Evidence that Loftus was falsely accused*

    *must be accepted as law of the case as he was exonerated of all charges by*

9   *numerous opinions of the Court of Appeal that suggest he was framed.*

10  *That is five known false accusations of sexual attack by this accuser prior*

11  *to age 16.   There are no statistics of any person being subject to so much*

12  *sexual attack in one lifetime by so many people on different occasions by*

13  *unrelated people; and previously by her uncle (medical interview),*

14  *such events have occurred only in cult communities, such as the Manson*

15  *family, in cases of hostages and sex slaves;*

16  *and in war zones like Serbia, where rape is an act of war and the tanks are*

17  *painted with images of pornography.*

18  *We also know these teenage rapes the accuser claims are false allegations,*

    *some admitted to as such, others declared as such by her*

19  *classmates/witnesses,*

20

21  *Balu alleges he is innocent and was falsely accused; actual injury defines*

22  *the constitutional inquiry and the gravity of the violations worthy of trial;*

23

24  *This malicious prosecution and abuse of process made nightmare a reality;*

    *Balu alleges he need not prove evil design, desire or motive on the part of*

25  *the defendants, but alleges they are disturbed people and if Balu could*

*subject them to psychological testing he could show that they are persons with serious personality disorders, sociopathy, take pleasure in sadism and victimizing the innocent; and were driven by personal gain.  The ADA, and her boss the DA at the time, Stephen Hedstrom who Balu alleges is liable here by respondent superior and because he took part in the investigation of this case and the violations committed by the ADA and the defendants; gained notoriety and advanced their careers by this malicious prosecution; this famed "vampire rape" case also gained them financial benefits from the State of California, Office of Criminal Justice Planning; Balu alleges this defendant issued grants to support this prosecution; Balu alleges they violated his constitutional right, along with the DA, and the ADA to substantive due process and equal protection of law and the right to freedom, as they held numerous conferences entitled "Statutory Rape Vertical Prosecution" which were grant seminars that encouraged prosecutors to fabricate criminal charges for the financial gain of their offices; paid bonuses and overtime to these district attorneys and encouraged them to create exaggerated and false "crimes."  Balu alleges here upon information and belief, that he has prima facie documents indicating meetings took place in which the Druckman participated related to a state grant program; that this program encouraged the prosecution of not only statutory violations, but encouraged the malicious prosecution of people by creating "vertical prosecutions" or escalation of charges; more money was paid out by the state in exchange for these prosecutions and convictions per county; the concept of vertical prosecution was not zero tolerance prosecution but "vertical" as the meetings, and the speakers and state planners discussed, for the purpose of escalating and increasing criminal charges whether true or not; for the purpose of financial gain to the state machinery and those that make careers from this; i.e. state offices, state agencies, county offices, state and local law enforcement, correctional systems, and the private profits related*

*to these contracts- known as the prison/industrial complex.  Balu seeks*

*relief and redress in Federal Court for these carefully planned crimes*

*committed against him by actors who acted alone and in conspiracy.  Balu*

*alleges the State of California in its official capacity is guilty of*

*violating the his fundamental constitutional right to life and liberty, and*

*for the reasons alleged here to be proven at trial must be held accountable*

*along with the defendants herein for this gross violation:  the systematic*

*arrest, trial, imprisonment, torture, brainwashing and permanent harm to an*

*innocent man.*

*SUBSTANTIVE DUE PROCESS AND TRIAL WHILE INCOMPETENT*

*SUBSTANTIVE DUE PROCESS CLAIM*

*THE TRIAL OF A MENTALLY INCOMPETENT PERSON IS AKIN TO THE TRIAL OF A PERSON*

*IN ABSENTIA; EXCEPT IT IS NEVER AUTHORIZED BY LAW.  IT IS A VIOLATION OF THE*

*FOURTHEENTH AMENDMENT SUBSTANTIVE DUE PROCESS TO TRY AN INCOMPETENT PERSON:*

*SUCH A PERSON IS NOT MENTALL PRESENT: IT IS AS IF THEY HAVE BEEN TRIED IN*

*ABSENTIA. BALU ALLEGES THE STATE OF CALIFORNIA AND THE DEFENDANTS DIRECTLY*

*RESPONSIBLE FOR EXACERBATING AND TRIGGERING SEVERE MENTAL SYMPTOMS BY MEANS*

*OF CRUEL AND UNUSUAL PUNISHMENT, AND THE DEFENDANTS RESPONSIBLE FOR HIS*

*CONSTITUIONAL RIGHT TO MEDICAL CARE, AND THE DEFENDANTS DIRECTLY RESPONSIBLE*

*FOR HIS TRIAL COMPETENCY, LISTED BELOW, ARE ALL GUILTY OF VIOLATING HIS*

*CONSTITUIONAL RIGHT TO DUE PROCESS OF LAW, HIS RIGHT TO BE MENTALLY PRESENT*

*AT HIS TRIAL, HIS RIGHTS UNDER THE FIRST TEN AMENDEMENTS OF THE FEDERAL*

*CONSTITUION AS THEY APPLY TO THE RIGHTS OF DEFENDANTS AND REQUIRE THE*

*PRESENCE OF THE DEFENDANT; THAT SUCH PROCEEDINGS VIOLATE THE CONSTITUIONAL*

*PROHIBITION OF BILLS OF ATTAINDER AS THEY CONSTITUTE PROCEEDINGS WITHOUT DUE*

*PROCESS OF LAW; STATE COURT FINDINGS OF FACT IN HABEAS PROCEEDINGS*

*COLLATERALLY ESTOP FURTHER LITIGATION OF THE ISSUE OF BALU'S COMPETENCE; THE*

*FINAL TERMINATION IS RES JUDICATA; THUS THE ISSUE UNDER CAREY V PIPHUS, US*
*SUPREME COURT, IS THE DETERMINATION OF ACTUAL DAMAGES. BALU ALLEGES THE*
*FOLLOWING PEOPLE VIOLATED THESE RIGHTS; BALU ALSO ALLEGES HERE THAT*
*REGRADLESS OF WHO IS PERSONALLY AND OFFICIALLY LIABLE FOR THE TRIAL OF BALU*
*WHILE INCOMPETENT, THE RES JUDICATA FINAL TERMINATION REQUIRES THIS COURT AND*
*TRIER VIEW THE DAMAGES PLED HERE AS ACTUAL INJURY IN ABSENCE OF THE ABILITY*
*OF THE STATE TO PROVE THE CONTRARY; THAT THIS TRIAL MUST BE A DAMAGES TRIAL,*
*A TORT FOR ABUSE OF PROCESS AGAINST THE STATE AND PRIVATE ACTORS PROVEN AS A*
*MATTER OF LAW.*

Balu alleges the Lake County Sheriff, Jail Division Sergeants Crouch and
Denton held Balu without bail in cruel and unusual conditions after his
arrest in 5/1997.  He was held for nearly 50 days in solitary confinement
without natural light; these condition impacted Balu severely as he had never
been in jail.  The no bail order was unconstitutional as a reviewable order
was not made and the Supreme Courts interpretation of the Bail Reform Act of
1994 was not followed.  Balu had symptoms of mental health issues, and these
Jail Sgnt's saw it as a way to exacerbate his symptoms to the point of a full
blown psychosis so he would fit the description of a blood ritual Satanist;
Balu turned 25 in a cell designed cause Pavlovian conditioning responses;
Balu was only let out in the dark of night for an hour at a time; thus could
not call family; Balu emerged on bail, after the Superior Court Judge ruled
the witness was essentially an "incredible" and "flippant" liar, in fancy
language.  When he did, he was institutionalized and could not go out of his
apartment at the Berkeley campus; he went to trial within 60 days of this, in
a complete psychosis.  During that trial, Balu was again held for a week in
such conditions, for being late; he complained of the effects of a "motor
psychosis," also known as schizoaffective disorder, and that caused him to be
unable to drive; the Court simply covered the record "for whomever wants to

review it," found him to be "not incompetent," and jailed him.  The
conditions the jail imposed on him included brainwashing through speaker
devices, where he was questioned as to his case constantly; visits by school
groups walking through where Balu was displayed like a circus freak or
oddity, called "the vampire," and constant abuse by Sgnt. Denton, who would
flash Nazi salutes and destroy Balu's reading material, constantly tell him
he would be convicted; and Sgnt. Crouch, who when not busy cavorting with
female inmates behind closed doors, exchanging flirts for clean socks, would
dp0arade Balu through the jail with electric shields and a dozen officers,
screaming at him asking questions like "Whats it like to rape a little
girl?," etc.; this Sgnt. was actually a friend of Detective Moorehouse,
fishing buddies; evidence exists in the records as to this and a disturbing
event-when Balu had poisoned himself in a suicide attempt, and was in a
catatonic state of toxicity combined with schizophrenia, these two Jail
Sergeants did "pain response" testing on him- they shocked him with a stun
gun.  These facts constitute cruel and unusual punishment under the eighth
amendment and in this case under the fourteenth amendment due process clause
as these events happened in pre-conviction detention; Balu was eventually
held for months in a 24 hour lockdown without natural light and let out in
chains one hour every other day in a room painted with red; these violations
were a calculated effort to deny Balu his humanity and mental health, to
portray him as a lunatic, in order to convict him.  Balu alleges that the
Lake County Sheriff and County are ultimately responsible for the behavior of
these jail personnel; Balu also alleges that the Lake County Mental Health
and contracted services there (John Doe contract provider) was responsible
for ensuring minimum health an mental hygiene standards and failed to do so,
and along with the State Board of Corrections, are liable for conditions at
that jail which shock the conscience and ultimately deprived Balu of his

Balu alleges here that his attorneys meet the color of law requirement because their state legal obligation as attorneys to declare a doubt as to their clients competence was not met; that this obligation was a performance of a public function as the statutory law obligation under CA pc 1368 is absolute; they meet the government nexus requirement as this obligation was shared with the state.  Despite defendant Bondoc privately declaring Balu to be "crazy" and bringing books like Faulkner "as I lay here dying to Court," actually having Balu, a defendant facing 60 years in prison at age 24 seated behind him in the observer area, rather than at the defense table, a situation unheard of in the USA, which happened because Balu could not rationally assist in his defense; Bondoc did not stop the trial and ensure his clients substantive due process rights were met.  His other attorney, Jai Gohel, attempted to use up his retainer by offering to buy Balu new underwear and driving him to Court like a 200 dollar an hour chauffer; during these rides he would ask "why are you so f—d up" with regard to Balu's mental state.  After sitting in court as a note-passer and observer for a couple of days in this immensely serious trial, Gohel's retainer ran out and he disappeared.  Gohel never defended Balu or did any work on his case; it isw alleged here that Gohel violated Balu's substantive due process right to be competent during his trial, by not declaring a doubt as required by state statute; that he was acting (or failing to act) under color of state law as this was part of a public function and government nexus as his responsibility was shared with the state; he was well aware of Balu's serious health problems, and failed to act; he simply misused client funds and came to pass notes; he also made comments ridiculing Balu; this man committed an omission that deprived Balu of constitutional guarantees, when sworn to act under color of law, pc 1368.

1  The ADA Druckman deprived Balu of his constitutional right to substantive due
2  process by failing to carry out her duty under color of law to assure the
3  trial of an incompetent did not occur.  Balu alleges the ADA intentionally
4  violated his state law guarantees because it was convenient to try an
5  incompetent person; she was able to antagonize him constantly by laughing and
6  jeering at him; at one point told his attorney to "1368" Balu, comment "off
7  the record," which indicated she was aware of the health condition Balu was
8  in but was willfully indifferent to it; the ADA was not acting as a
9  prosecutor in her function under section 1368; she does not have absolute
10 immnunity in this area.  She was obligated to act as an officer of the court
11 and not as people's advocate; the obligation to assure the fundamental due
12 process right of mental competence and the absolute immunity from prosecution
13 persons incompetent have is simply not a matter of immunity becase it falls
14 outside the prosecutors role of trying the case, and is in fact an obligation
15 shared with the attorneys for Balu; this shared role under state law to
16 protect all defendants in this substantive due process right is an
17 independent function and obligation to no different than any sworn role; this
18 was an immunity granted to Balu by the US Constitution, and the ADA and the
19 DA did not honor this fundamental right out of malicious prosecution; the
20 facts of this case make it clear why this right was violated; the ADA has an
21 obligation to ensure defendants are mentally present and have the cognitive
22 or sensory capability of appreciating what is happening, and there can be no
23 immunity for the purposeful trial of a person immune from punishment, such as
   a child or idiot; in this case an insane or incompetent person; these are
   violations of state statute and thus Balu's right to equal protection of law
   was violated as well.

*THE STATE OF CALIFORNIA, DEPARTMENT OF MENTAL HEALTH, AND DR. ERIC SIMON,*
*VIOLATED BALU'S CONSTITUTIONAL RIGHT TO FREEDOM BY EXTENDING HIS IMPRISONMENT*
*BY A FRAUDULENT CIVIL COMMITMENT.*

Dr. Eric Simon conducted a PC 2962 (MDO) evaluation of Balu prior to his parole. In it, he lied and misrepresented many facts which led to his certification, need for treatment, at which time he was force-drugged, and subject to indefinite commitment for up to natural life unless he won at trial.  Dr. Simon was found to have been evasive and have lied at the trial in Superior Court, by the Judge on this issue: He stated Balu had suffered from vampire delusions and had been observed chanting to himself in vampire themes.  This was the report he made in writing that allowed the DMH to certify Balu and cause his commitment.  Absent this perjury on paper and at trial, there was no way to commit Balu as the factors of a violent disorder related to the alleged behavior.  Balu alleges Dr. Simon, by act of fraud violated his constitutional right to freedom and bodily integrity; and that Mel Hunter, J.D., director of Atascadero State Hospital, the one who allowed commitment by such certification; and the Department of Mental Health are all liable for the fraud that extended Balu's false imprisonment by fraud for several months.  Balu refers the Court to the pleadings on file in the Central District and Ninth Circuit where he complains of this prior to his release; those claims are therefore preserved because the magistrate judge improperly denied Balu's in forma pauperis on the grounds of exhaustion; rather than grant the fee waiver and then deny the complaint on administrative remedies; when Balu appealed to the Ninth Circuit to argue state hospital civil patients are not prisoners and exhaustion doctrine does not apply, he could not pursue his appeal on this issue because the fee waiver had not been granted.  There was no way to appeal the exhaustion requirement without the fee waiver on appeal which comes out of the District

Court. This effectively caused the complaint regarding these allegations to
be on hold indefinitely; Balu alleges here that the separate freedom related
claim being made here against Dr. Simon, Mel Hunter, and DMH, is tolled and
in abeyance due to the improper procedure the magistrate used which made it
impossible to appeal to the Ninth Circuit; all documents are on file there.

*FACTUAL INJURY ALEGED: DETAILS*

Balu alleges the following injuries have taken place:

Loss of Freedom, Emotional Distress, Penetration by Needles for DNA and for
Forced Drugging (documented in case 128060 before the California Supreme
Court, informal briefing ordered/AG investigates and state moots question by
ending practice of involuntary medication without order by Court), Physical
Pain and Suffering; Loss of Family members; Loss of Reproductive Rights and
Right to Parenthood and Spousal Relations; Loss of Income; Permanent Medical
Problems- Trauma Related, Flashbacks, psychiatric, and neurological in the
from of permanent brain injury shown by MRI and CT scan; Seizure Episodes;
this medical evidence will be shown by several doctors and experts in this
field; Permanent Loss of Educational and Career opportunity and Potential-
based future income based on these injuries and Loss of Reputation caused by
the social surrounding these evils, as evidenced by a previous discrimination
action before the Honorable Susan Illston of this Court, which Balu was
unable to complete due to numerous hospitalizations, and state court actions
strata the public is unwilling to accept the concept that Balu was wrongfully
convicted, and organize community movements to drive him out of his home (as
discussed herein) and organized discrimination at college- after filing 42
USC 1983 to address that there, Balu was promptly accused of numerous
fabricated events of "misconduct," labeled mentally ill, retaliated against
for filing the case, and dismissed after a hearing *in absentia,* now nearly

two years after the final and permanent dismissal under pc 1385 of his case "in the interest of justice" he still suffers discrimination; his neighbors as of the last week have dispatched police to his home with false reports, simply to have him abused, as Balu writes this, Oakland Police officers have been swarming around his home, forced entry, and inspected the documents around this laptop, like the big bad wolf, responding to neighbors crying wolf; people are outside passing out flyers, the police are suggesting they all get restraining orders so Balu cannot walk outside without being arrested; it is difficult to imagine a normal life, when in a median income area of Oakland California, a liberal city rich with a civil rights history, Balu is subject to hatred on his own family property which is owned, ownership of land itself not freedom from dislocation; it is clear that Balu is being persecuted indefinitely by de facto bill of attainder by what would seem to be ordinary people, as a result of the crimes committed by the defendants, by more civil rights violators; Lifelong Stigma due to distrust and the public's tendency to choose ignorance and opt to exclude Balu rather than question their systems of government; this ignorance can be expected to exclude Balu from the types of private workplace much less the public workplace and campus; and Balu's private life is severely impacted by the fact that persons from so called "educated classes" do not accept him socially, impacting his freedom of association by a scarlet letter; as Professor Barry Scheck has argued through his Innocence Project, and drafted model compensation statutes for the ABA, that without compensation a person like Balu will not be accepted as an equal; economists have argued the price (see Ny Times article-11/07-"Putting a Price on Wrongful Conviction" is that of wrongful death.

As a direct and proximate result of Defendant's policies, practices, and conduct and acts alleged herein, Balu was denied his constitutional rights and prosecuted in abuse of process and maliciously, and falsely imprisoned

for nearly eight years.  As a result, he suffered and continues to suffer

mental and emotional distress, humiliation, embarrassment, anxiety and pains,

as stated herein.  Balu also was subject to the third party harm of seeing

his mother suffer to the point she does not recognize him at times.

Defendant's misconduct justifies an award to Balu of compensatory, punitive,

and third party harm damages in an amount to be determined at trial, and of

reasonable attorneys fees for his advisory counsel and any work product or

representation counsel should go on record to do.


Wherefore, Balu prays that the Court as to all the defendants and of them

jointly and severally:

1.   Award compensatory and general damages against all defendants and each

     of them, for Balu, in an amount to be determined according to proof;

2.   Award exemplary, punitive, and third party harm damages in an amount

     to be determined according to proof;

3.   Award Balu his costs and reasonable attorneys fees that occur and

     award those lawyers that work without charging fees in advance their

     Lodestar figure pursuant to 42 USC 1988; and

4.   Grant such other and further relief as suggested herein and as the

     Court may deem just and proper.




## JURISDICTION AND VENUE

Jurisdiction in the Northern District Federal Court of California is

appropriate because Balu lives in Oakland, Ca and the acts complained of

occurred in the Court's jurisdiction and venue under 28 USC 1391, because a

substantial part, if not all, of the events and omissions giving rise to

Balu's claim occurred in this District.

1    This Court has jurisdiction for civil rights litigation within 42 USC 1983

2    and 42 USC 1985, statutes of the United States, pursuant to 28 USC 1331.

     This Court has personal jurisdiction over each defendant named herein, as it

3    is believed each defendant is currently domiciled in the State of California.

4                                    PARTIES

5    Plaintiff Balu was a resident of Berkeley, Ca, and now of Oakland, Ca, and at

6    all times a citizen of the State of California.

7    The Defendants in this case either reside within the jurisdiction, or

8    did so at the time of the actions complained of. Their positions and titles

     are described as:  Lake County, a county in Northern California.  Lake County

9    Sheriff, a law enforcement agency in Lake County; former Detective Jan

10   Layfield employed by the Lake County Sheriff at the time of these events;

11   Lakeport Police Department; Officer Erickson, employed as a Lakeport Police

12   Officer at the time of these events; Jail Sergeants Denton and Crouch, part

13   of the Lake County Sheriff at the time, Berkeley Police Department, part of

14   the city of Berkeley, the City of Berkeley, a college town in Northern

15   California, (two unknown agents of that department) Contra Costa County, a

16   county in the East Bay, Contra Costa County Crime Lab, a criminal forensics

17   lab in that county; CSI person Kimmel, a technician at that lab, first name

     and exact title in records; City of San Francisco, a city in Northern

18   California, San Francisco County, San Francisco Police Department, Detective

19   Moorehouse, employed there at the time, first name in records; Lake County

20   District Attorney, Former DA Stephen Hedstrom, Former ADA Rebecca Carol

21   Druckman; Lake County Probation Department, Atty. Rommel Bondoc,

22   Atty. Jai Gohel, Balu's trial attorneys, still in practice in San Francisco,

23   Victim Witness Program (JANE DOE), A program in which a lady sits with the

24   witness at the trial and holds teddy bears, offers support, walks around and

     baby-sits the witness, California Department of Mental Health, Director of

25   ASH, a state hospital, Mel Hunter the lawyer who runs that hospital, Eric

Simon, a contract employee for the DMH; Office of Criminal Justice Planning, Child Protective Services,(Supervisor and reporter there), agencies of the State of California; The State of California, a state of the union that takes responsibility for wrongful conviction through its victims compensation fund.

DEMAND FOR JURY TRIAL

Plaintiff Balu hereby demands a trial by jury for all issues so triable.

Dated: June 11, 2008

Respectfully Submitted,

Arvind Balu

Under advice and consultation of the attorneys listed, and the personal notes of his previous post conviction attorneys, including Lauren Eskenazi and Fred Snyder

1  EXHIBIT A: PETITION FOR FACTUAL INNOCENCE/ON FILE WITH THE COURT BELOW;

2  DECLRATIONS AND EXHIBITS LODGED IN SUPERIOR COURT OF CALIFORNIA, LAKE COUNTY

3  (SUPPORTS CLAIM OF ACTUAL INJURY)

4

5                      SUPERIOR COURT OF CALIFORNIA

6                            COUNTY OF LAKE

7  _____

8                                        )

9                                        )

10  THE PEOPLE OF THE STATE OF            )    Action No.  CR904408

11  CALIFORNIA,                           )

12                                        )    MEMORANDUM OF POINTS AND

13          Plaintiff and                 )    AUTHORITIES IN SUPPORT OF MOTION

14  Respondent,                           )    FOR FINDING OF FACTUAL INNOCENCE

15                                        )    PURSUANT TO PENAL CODE §851.8(c).

16  v.                                    )

17                                        )

18  ARVIND BALU,                          )

19                                        )

20          Defendant and                 )

21  Petitioner.                           )

22  _____

23

24  I.    Introduction:

25

1    On May 16, 1997, a twenty one year old college student named Arvind

2  Balu was arrested and charged with five serious felonies after a teenager

3  named Melissa F. reported that he had tied her up, raped her at knife point,

4  cut her with the knife, and then licked her blood. This assault was supposed

5  to have occurred approximately nine months earlier during July, 1996, at the

6  Konocti Harbor Resort.[1]

7    Knowing what we now know, it seems remarkable that criminal charges

8  were ever brought as a result of these allegations. What has come to light

9  are a remarkable number of circumstances that plainly establish that these

10  charges were false. These circumstances include the implausible and

   inconsistent accounts given by Melissa to police and others; her unexplained

11  failure to say a word about them to anyone for more than nine months; her

12  immediate destruction of the pages in her diary relating to her trip to Clear

13  Lake once, against her wishes, her rape accusation was reported to the

14  authorities; and much other information that casts doubt upon her

15  credibility.

16    Now that all charges against Mr. Balu have been dismissed, there is one

17  final step to be taken. Pursuant to Penal Code §851.8(c), he respectfully

18  asks this court to evaluate all of the evidence bearing on the truth or

19

20  [1]The information charged Mr. Balu with assault with a deadly weapon

21  [Penal Code §245(a)(1)], false imprisonment with use of a knife [§§236

22  and 12022(b)(1)], forcible oral copulation [§288a(c)], forcible rape

23  [§261(a)(2)], and forcible rape in concert [§264.1], with use of a

24  knife. A co-defendant, Brendan Loftus, was jointly charged with the

25  latter two offenses, as well as two misdemeanors.

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 55

1   falsity of the charges, and to determine whether that evidence supports a

2   finding of probable cause to believe he committed those crimes. If it does

3   not, then a finding of factual innocence should be made, and Mr. Balu should

4   be given a chance to rebuild his life free from the stigma of these false and

5   infamous accusations. The increasingly sensational nature of the accusations

6   made against Mr. Balu by Melissa generated much publicity. Mr. Balu now

7   exists in that grey zone where he is not guilty, but the accusation hangs

8   heavily over his head. Unless formally cleared, this accusation will remain

    an anchor around his neck.

9   **II.  Legal Standard:**

10       Penal Code §851.8 provides a mechanism for defendants whose criminal

11  charges have been dismissed to seek a judicial finding of factual innocence

12  upon a showing that there is no reasonable cause to believe the charges are

13  true.   (Penal Code §851.8(b), (c); *People v. Adair* (2003) 29 Cal.4th 895,

14  902-904; *People v. McCann* (2006) 141 Cal.App.4th 347, 352-355.) "Reasonable

15  cause is a well-established legal standard, defined as that state of facts as

16  would lead a man of ordinary care and prudence to believe and conscientiously

17  entertain an honest and strong suspicion that the person is guilty of a

18  crime." (*Adair*, *supra*, 29 Cal.4th at 904, citations omitted.)

19       According to the statute, "the initial burden of proof shall rest with

20  the petitioner to show that no reasonable cause exists to believe [he]

21  committed the offense[s] for which the arrest was made."   (Penal Code

22  §851.8(b); *Adair*, 29 Cal. 4th at 903.)   Once that burden has been met, the

23  statute shifts the burden to the prosecution to show that reasonable cause

24  does, in fact, exist to believe the defendant is guilty of those charges.

    (*Ibid.*)

25

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 56

1    This post-dismissal assessment of the evidence is made on the basis of

2    evidence available at the time of the hearing on the petition, as opposed to

3    the date the arrest was made or the charges were filed. Further, all relevant

4    evidence bearing on the issue of guilt or innocence may be considered, even

5    evidence that would have been inadmissible at trial.    (*People v. Chagoyan*

6    (2003) 107 Cal.App.4th 810, 815-817.)   A judge hearing a petition under Penal

7    Code §851.8 is a fact finder and is not required to accept all testimony as

8    true. The Court is empowered to make credibility determinations based on all

9    of the currently available evidence, and these determinations are entitled to

10   the usual deference on appeal. (*Adair,* 29 Cal.4th at 901.)

**III.  Evidence Showing Mr. Balu's Innocence:**

11       With these principles in mind, petitioner will summarize the facts and

12   circumstances that show there is no reasonable cause to believe he is guilty

13   of these crimes. These facts and circumstances include: (1) Melissa's

14   implausible and inconsistent accounts of the alleged crimes, which lack

15   corroboration and, in at least one respect, were proven false by subsequent

16   police investigation, (2) her failure to say anything to anyone about the

17   alleged crimes for more than nine months, (3) her destruction of evidence,

18   namely the pages of her diary relating to her stay at Clear Lake, as soon as

19   her accusation was reported to the authorities against her wishes, (4) other

20   entries in her diary beginning just three days after the alleged crimes that

21   conspicuously fail to mention anything bad happening during the trip to Clear

22   Lake, and whose tone and substance is incompatible with her allegations that

23   she bound, gang raped, and cut with a knife just a few days earlier, (5)

24   evidence from multiple sources that Melissa frequently lied about sexual

25   matters, and in particular, that she falsely claimed that she was sexually

     assaulted by another man with a knife just one month before the alleged

1  crimes in this case, and (6) evidence that Mr. Balu passed a polygraph

2  examination in 2001 concerning all of the charges in this case.

3  Any one of these categories of exculpatory evidence would be sufficient

4  to raise serious doubts about the truth of the charges in this case. The

5  confluence of all permits only one rational conclusion – the charges against

6  Mr. Balu are false, and that there is no reasonable cause to believe he

7  committed those crimes.

**A.    Melissa's Implausible and Inconsistent Accounts of the Alleged Crimes.**

8

9  Even the most basic facts of Melissa's story do not jibe with common

   sense notions of human behavior.  According to Melissa, she was tied up,
10
   raped and assaulted with a knife by two U.C. Berkeley students. By her
11
   version, the students decided to commit these outrageous crimes in a hotel
12
   room where they were registered under their own names, knowing that at least
13
   two other witnesses had seen them in the room together, and knowing that
14
   Melissa's father was a police officer who was staying at the same hotel. (RT
15
   1150-1151.)  This scenario makes no sense, unless one is prepared to believe
16
   that these university students with bright futures could not have cared less
17
   about being arrested and prosecuted for the violent rape of a police
18
   officer's daughter.[2]

19

20

21
   [2]   Nor does it make any sense that they would have *blindfolded*
22
   Melissa when they attacked her, as she also claimed (RT 717-719, 737),
23
   since they could not have possibly thought that she or anyone else
24
   would have trouble identifying them if these alleged crimes were
25
   reported.  Like so many other aspects of Melissa's story, this detail

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 58

1      The implausibility of Melissa's story, however, is by no means the most
2   striking evidence of its falsity.  In addition, there is the stunning lack of
3   corroboration.   Melissa's account that she was slammed against a wall,
4   wrestled onto a bed, stripped and tied by her wrists and ankles to the
5   "posts" on Mr. Balu's bed, then cut several times with a knife while she was
6   forcibly raped by the two defendants was uncorroborated by any physical
7   evidence or observations of physical evidence, and in at least one important
8   respect, was proven false by the subsequent police investigation.

9      There was no physical evidence, like blood stained clothing or sheets,
    that would corroborate Melissa's story of violent sexual assault.[3]  In fact,
10  the Lake County deputies who investigated the case discovered that there were
11  no bedposts or other features on the bed in Mr. Balu's room that Melissa
12  could have been tied to, proving that this aspect of Melissa's story was
13  clearly false.  (RT 1965-1966, 1712-1713.)  When asked about this, Melissa
14  initially said that maybe just her hands were tied, then later claimed –
15  under oath – that she never told the police she was tied up at all.  (RT
16  1730-1731, RT 848-850.)

17     In  addition,  there  was  no  evidence  that  Melissa  displayed  any
18  consistent physical injuries on the date these crimes are supposed to have
19  occurred, and no credible evidence that she displayed any injuries during the

20

21
22  seems more likely to be contrived to garner sympathy than be real, and
    it is one of many clues that her story is false.
23
    [3]   According to Melissa, like the crucial pages in her diary, she
24  also threw away her bloodstained pants at some point after the alleged
25  crimes.  (RT 1050.)

1    days and weeks that followed.[4]  Likewise, there was no evidence that Melissa

2    exhibited any adverse emotional reaction on the date these crimes are

3    supposed to have occurred, and no credible evidence that she displayed such a

4    reaction during the days and weeks that followed.[5] It strains credulity that a

5    fourteen year old virgin could be tied up, be cut repeatedly with a knife

6    while being raped by two men while on a vacation with her parents, and then

7    not betray in some way that these crimes have occurred. The absence of any

8    physical evidence, injury, or emotional reaction that one would expect to

9

10

11   [4]   Melissa's parents told police in May of 1997 that they remembered

12   seeing a *single cut* on Melissa's leg at the resort in 1996, which they

13   had no occasion to recall or discuss for more than nine months, and

14   which is *inconsistent* with Melissa's account of being cut *several*

15   times on the legs by Mr. Balu. (See, Exhibit B, Morehouse letter; RT

16   724-732, 743-745, 877, 1398, 1448-1449.) The sheriff's investigator

17   and evidence technician also observed and photographed faint evidence

18   of old cuts or scars on Melissa's legs in May of 1997, but they

19   obviously could not determine when or how these cuts were sustained.

20   (RT 1548-1555, 1714-1715.)

21   [5]   Melissa's parents testified at trial that she became withdrawn

22   and depressed after their trip to Clear Lake, as if she were

23   concealing some terrible secret. (RT 1400-1402, 1451-1452, 1478-

24   1481.) This testimony, however, is utterly belied by Melissa's diary

25   entries from July 9, 1996 on, and the statements of her friend that

  her behavior was unchanged. (See, part III.D., *post.*)

1  find after such an outrageous attack strongly indicates that it did not
2  occur.[6]

3     Other inconsistencies in Melissa's story, from one telling to the next,
4  relate to important details such as whether her shirt was removed during the
5  assault (RT 846-848, 1966), whether she saw a knife at any point during the
6  assault (RT 850-853, 1105, 1109-1110), and who was in the room when her
7  "blindfold" was removed (RT 737, 1967), all details she could be expected to
   remember. Finally, as discussed below, Melissa's account of how these alleged
8  crimes finally came to be "disclosed" more than nine months later was also
9  riddled with inconsistencies and falsehoods, and further demonstrates that
10 her allegations in this case are unworthy of belief.

11 **B.   Melissa's Failure to Tell Anyone About the Alleged Rapes for Nine**
12     **Months.**

13     Melissa's failure to say a word to anyone about these alleged crimes
14 for more than nine months (RT 749, 905) is additional, powerful evidence that
15 they never occurred.  It is true, of course, that delays in reporting a
16 sexual assault do not necessarily mean that such a report is false. However,
17 under the circumstances presented by this case, that is by far the most
18 likely explanation.

19

20

21
   ─────────────────────
22 [6]  In addition, Melissa was seen hanging around Mr. Balu's hotel
   room *the night after the alleged offenses,* and evidently had a
23 conversation with him after he returned from a party at another
24 resort.  (RT 2020-2022.)  This is an astonishing detail which further
25 casts doubt on Melissa's story about what happened inside that room.

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 61

1       First, we are not talking about a confused child with an emotional or

2  familial attachment to the perpetrator, but a teenager who displayed only

3  contempt for Mr. Balu, and no inclination to want to protect him.

4       Second, Melissa was clearly not inhibited by her personality or tender

5  years from understanding or talking about sexual matters. On the contrary,

6  the evidence shows that at the time of these events, she was more or less

7  *preoccupied with sex,* and with being victimized sexually. In her diary and

8  her conversations with peers, Melissa frequently and graphically described

9  sexual activity, and was widely known as someone who told lies about sex and

10  sexual victimization in order to get attention or sympathy, including falsely

11  claiming that she was attacked by a man with a knife just one month before

12  the alleged crimes in this case. (See, part III. E., *post.*) Aside from the

13  obvious relevance this information has to Melissa's credibility, it also

14  negates, as an explanation for her delayed reporting of these crimes, that

    she was too naive or embarrassed to speak about such matters.

15       Third, the circumstances under which Melissa first reported these

16  alleged crimes provide further evidence of her dishonesty, and also rebut any

17  innocent explanation she might have had for destroying all of the pages in

18  her diary concerning the trip to Clear Lake.   (See, part III.C., *post.*)

19  According to a drug and alcohol counselor at Melissa's school, Cheryl Minton,

20  Melissa first reported an alleged rape on April 24, 1997, while attending a

21  counseling session for "Outrageous Girls" with her friend, Melissa Strong.

22  (RT 1818-1821; Exhibit C, Minton's report.)  According to Ms. Minton, Melissa

23  spontaneously volunteered during this session that she had been raped by

24  "someone" the previous summer at the "reservoir." (*Ibid.*)  When Ms. Minton

25  informed Melissa that she was required to report this matter to the

    authorities, Melissa's demeanor quickly turned to panic, and she begged

1 Minton not to report it.   (RT 902; Exhibit D, letter from Melissa Strong.)
2 Ms. Minton was legally obligated to make the report, however, and promptly
3 sent a memo containing this information to the school guidance counselor,
4 Barbara Schulman.   (Exhibit C.)   Ms. Schulman then met with Melissa that
5 Friday afternoon and the following Monday, and together they reported the
6 rape allegation to Child Protective Services.   (RT 884-888.)[7]

7 Melissa lied to the jury repeatedly about these events. At trial, she
8 testified that the triggering event, in her mind, for all of these meetings
9 with school counselors was the theft of her diary from her backpack at
school. After which rumors about the rape began spreading among the students.
10 (RT 795-797, 910-912, 939.) According to Melissa, right after this happened,
11 she was approached by Ms. Schulman, who she claimed already knew about the
12 rape and asked her about it. (RT 796, 884-888, 916.) Melissa testified that
13 she assumed Ms. Schulman found out about the rape by reading her diary, which
14 is also what she told her parents when it became clear that they, too, would
15 find out it.   (RT 794-795, 880, 883, 912.)

16 The truth, however, is that Ms. Schulman found out about the rape
17 allegation from Melissa herself, who showed up at her office in an attempt to
18 prevent her accusation being forwarded to Child Protective Services.   (RT
19 1817-1824, 1860-1862; Exhibits C and E.)   Clearly, Melissa's aim in going to

20

---

21 [7] When reported, the accusation is again inconsistent. When it came time to report this incident to Child
Protective Services, Ms. Schulman put Melissa on the phone with CPS in Contra Costa County. The fact
22 that she did so, and the name of the person at CPS to whom the report was made is documented in Ms.
Schulman's reporting form which is attached as Attachment 2 to petitioner's sentencing memorandum.
The person at CPS was Dennis Cronin. Dennis Cronin's computer print out of the report is attached as
23 Attachment 3 to the sentencing memorandum. In that report Melissa claims that when Melissa
"was on summer vacation in 1996 at Clear Lake, she spent a lot of time with her new
24 boyfriend. This same boyfriend had also raped her on one occasion. CH did not want
teacher to report to CPS because the disclosed the incident happened when both she and
25 boy were drinking alcoholic beverages, something her stepfather forbids."
Again the report is of a single person, but now that person is her boyfriend who had raped her previously.

1   Ms. Schulman was to try and convince her not to report the "rape" to the

2   authorities or her parents because it was a false accusation. As for the

3   counseling session with Ms. Minton, Melissa testified that Minton also

4   already knew about the rape and had asked her about it. (RT 885, 898) This we

5   know from Ms. Minton and Melissa Strong also to be false. (RT 1817-1824;

6   Exhibit D.)

7       Accordingly, Melissa's initial "reports" of the alleged crimes in this

8   case provide evidence that her allegations against Mr. Balu are lies; a

9   fabrication that was cobbled together after her initial play for sympathy

    from Melissa Strong and the school counselor caused events to spin out of her

10   control. She had not anticipated the reporting requirement and when

11   confronted with it she first tried to stop the report from being made. When

12   that failed, she began to make things up as she went along. Each telling

13   becoming more lurid than the last.

14       In the first place, her reports to both school counselors lack too many

15   critical details that were added in the later versions Melissa later gave to

16   police and jurors. For example, these initial reports neglected to mention

17   that there were two assailants, or that Melissa had been tied up, or that a

18   knife was involved, or that she was on vacation with her parents. In

19   addition, these initial reports apparently lacked any of the emotion one

20   would expect to find when the burden of such a terrible secret is lifted.

21   Finally, Melissa's later accounts of how she came to make these reports at

22   school were characterized by duplicity at every turn. Ultimately, the

23   circumstances of Melissa's delayed "disclosure" of the alleged crimes in this

24   case leave the trier of fact with no credible, innocent explanation as to why

25   she would wait more than nine months to tell anyone, and no credible,

    innocent explanation as to why she would destroy all of the pages in her

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 64

1  diary relating to these allegations as soon as they were reported to the
2  authorities.

3  **C.    Melissa's Destruction of the Crucial Diary Entries.**

4      Melissa's destruction of all of the pages in her diary relating to her
5  trip to Clear Lake, and the timing of that destruction of evidence, is
6  perhaps some of the most compelling evidence that her allegations are false.
7  Her explanation for why she ripped these pages out of her diary and tore them
8  into little pieces was that she was angry at other students for having read
9  them. This is also her explanation for how the counselors got involved and
   forced the report of the matter to the authorities.  (RT 797-800, 917-919,
10  921-922, 932-938, 1132-1133.)

11      Even if this explanation made any sense, which it doesn't, we know it
12  is false. As set forth in part III.B., *ante*, we know that it was Melissa who
13  first brought up the alleged rape during the counseling session with Ms.
14  Minton, which means that she knew from the very beginning that the diary
15  played no role in the publication of her rape story.[8] Given that Melissa's own
16  explanation for destroying this evidence was false, there is only one
17  reasonable explanation for destroying all of the pages in her diary relating
18  to Clear Lake right after her rape accusation was reported to the
19  authorities. Melissa didn't want anybody to read these diary entries because
20  they would prove she was lying about what happened. Melissa's methodical
21  destruction of the only contemporaneous record of what happened at the
22  Konocti Harbor Resort as soon as she knew her story would be subjected to

23

24  [8] This was admitted by Melissa to Ms. Shulman. Ms. Schulman met with Melissa the Monday following
    the initial disclosure. Melissa was waiting for Ms. Schulman at Schulman's office. Melissa told Ms.
    Schulman that Melissa had told her parents about the rape. She also said that she had lied to her parents
25  by telling them that Ms. Schulman learned about the rape after finding and reading Melissa's diary. RT
    1868-1869. This was the first time that the diary had been mentioned between Melissa and Ms. Shulman.

1  public scrutiny is the smoking gun that proves that story is false.  There is
2  no other reasonable explanation for her conduct.

3  **D.  Other Entries in Melissa's Diary**

4      The balance of Melissa's diary provides even more compelling evidence
5  that her accusations in this case are false.  These diary entries, which
6  begin on July 9, 1996, and continue through March 21, 1997, do not even
7  obliquely refer to a sexual assault, or indeed anything bad happening during
   the trip to Clear Lake.  (Exhibit B, pp. 26-36.)  In fact, the first three
8  entries after the eleven pages Melissa destroyed, dated July 9, 10, and 11,
9  1996 (i.e., the third, fourth, and fifth days after the alleged rapes) are
10 concerned exclusively with trivial squabbles with her friend, Jenn, and
11 passing infatuations with two boys named Josh and Toad, and do not even hint
12 at the possibility that Melissa was the victim of a terrifying gang rape
13 three days earlier.  (*Id.* at pp. 26-28.) The remaining twelve entries after
14 the trip to Clear Lake, covering the next six months, are similarly concerned
15 with trivial social events and a succession of older boys that Melissa
16 professes to "love" on one page of the diary, and "hate" on the next. (*Id.* at
17 pp. 29-36.)  No mention is made of a rape, or anything bad happening during
18 the trip to Clear Lake or at all that summer.

19     Not only are Melissa's diary entries following her trip to Clear Lake
20 incompatible in tone and substance with the notion that she was the victim of
21 a terrible sexual assault on July 6, 1996, they also conclusively rebut the
22 testimony of her parents that she became increasingly withdrawn and depressed
23 after the trip. In fact, the last eight diary entries before the trip that
24 were not destroyed by Melissa, dated May 6, 1996 through May 28, 1996,
25 express a great deal more pain and self-hatred than any of the entries made
   after the trip.  (*Id.* at 19-24.)

For example, on May 21, 1996 Melissa writes:

> Broken hearts and hollow sounds are what make this wicked world go round. Painful words that sting right to the bone and solemn faces are what used to be my home. I look back and what do I see, the other side of my broken family. The more I cry, the more I die. (Id. at 21.)

Then, on May 27, 1996:

> Well, I figured out why Jarrod doesn't like me. It's not just cause I'm fat. It's cause I'm a whore. God, why do I do things I do? (Id. at 22.)

And the next day, a "poem":

> My cries are silent, no one can hear. My cries are violent, no one is here. I almost go crazy, without a thought in my mind. My life is only hazy, with only crime. I feel like crying. No one can see. For my cries are so silent, and no one knows. Even then no one cares. I feel really depressed, yet I like to share. I am really impressed by the face I have on in front of everyone. But when I leave, my cries are silent. And then I feel violent. (Id. at 24.)

No diary entry by Melissa *after* the trip to Clear Lake expresses similar feelings of depression and self-hatred. On the contrary, the diary entries that follow the trip, except for a couple of entries concerning her father and stepfather, are much more carefree and "boy crazy" than the ones that come before. These diary entries effectively disprove the belief of Melissa's parents that she became traumatized and depressed after the trip to Clear Lake, and in fact, tend to prove the opposite.

Finally, various entries in Melissa's diary suggest a psychological explanation for her false accusations in this case. Although no clinical information is available concerning Melissa's psychological state in 1996 and 1997, her diary supports the conclusion that she suffered from extremely low self-esteem during this period, and compensated for this by acting out sexually. When that strategy inevitably failed, Melissa would be confronted

1   with the consequences of her behavior, namely, even lower self-esteem *and* a

2   damaged reputation.  Her way of dealing with this was to tell lies, which

3   only made the problem worse.

4       Two months before the trip to Clear Lake, for example, Melissa wrote:

5   *"Why am I so obsessed with the idea of playing guys?"*  (*Id.* at 19.)  Then, on

6   May 27, 1996: "Well, I figured out why Jarrod doesn't like me.  It's not just

7   cause I'm fat.  It's cause I'm a whore.  God, why do I do things I do?"  (*Id.*

8   at 22.)  Finally, on July 31, 1996, just three weeks after the alleged crimes

9   in this case, Melissa wrote: "So far this vacation has taught me I'm a slut

    and a fake.  Even though both aren't true!"  (*Id.* at 28.)

10

11      This is not a young woman who likes or respects herself.  Rather, in

12  1996 and 1997, Melissa was an insecure teenager who defined herself by the

13  sexual encounters she sought out.  Unfortunately, these encounters inevitably

14  made her feel like a "slut" and a "fake", and she would resort to lying to

15  shore up her damaged reputation. This dysfunctional pattern not only helps

16  explain how Melissa sought out Brendan Loftus at Konocti, but also why she

    would feel the need to lie about it ten months later.

17      Melissa's high-risk, low self-esteem, deceitful personality is further

18  corroborated by information gathered from her peers after the trial. They

19  verify her predilection for lying about sexual matters, in particular, in

20  order to get the attention and sympathy she craved.  (See, part III.E, post.)

21  **E.    Melissa's Reputation For Dishonesty in the Community:**

22      In addition to the other evidence that Melissa's allegations in this

23  case are false, there was considerable evidence developed after trial that

24  she had a reputation for telling lies, especially about sexual matters.

25  Attached to this petition are records of interviews with five of Melissa's

    classmates and one parent of a classmate, all of whom provide specific

1  examples of her dishonesty, including the astounding revelation that she
2  falsely claimed she was attacked by a man with a knife just one month before
3  the alleged crimes in this case.

4      Deborah Barton, who testified at the hearing on a motion for new trial
5  in this case in  1998, states in her declaration that Melissa often "told
6  lies to seem more cool and get people to like her." (Exhibit F, p. 1.) She
7  specifically recalled the following conversation with Melissa in June of
8  1996, just one month before her trip to Clear Lake:

9          Melissa told me that a man jumped out of the bushes [behind
       the coffee shop where they hung out] and tackled her and cut her
10       shorts open.  She said she thought he was trying to rape her.
       She got away, but did not tell me how she managed to get away.
11       Melissa told me this story without any real drama, but only said
       she was scared.  I did not believe her, and never heard about
12       this incident again.  (*Id.* at p.4.)[9]

13      Deborah spoke to Melissa about the trip to Clear Lake after she
14  returned, and recalled that Melissa told her she "met a couple of really cute
15  guys [there] and the trip was a lot of fun."  (*Id.* at p. 3.)  She further
16  stated that she saw Melissa almost every day that summer, and that she never
17  mentioned anything bad happening during the trip to Clear Lake. Finally,
18  Deborah confirmed that she did not notice any change in Melissa's
19  personality, or any cuts on her legs, after that trip.  (Id. at 1-2.)

20      Other classmates and acquaintances of Melissa's corroborate Deborah's
21  observation that Melissa had a tendency to tell lies about her sexual
22  experiences, and about being victimized sexually. Mike Del Monte, for
23  example, executed a declaration in December of 2001 that he had sexual
24  intercourse with Melissa after he turned seventeen in August of 1997.

25  [9] That this accusation was false was acknowledged by Melissa F. to the investigation officer ...

1   (Exhibit F, at p.1.)    According to Del Monte, a few weeks later, he
2   confronted Melissa about rumors he had heard that she was saying he had
3   gotten her pregnant with twins.    Melissa responded that "if [he] did not
4   accept responsibility for the 'twins', that she would call the police and
5   tell them that [he] had raped her." (*Id.* at p.2.)    According to Del Monte, he
6   could not possibly have made Melissa pregnant, and after that meeting, he
7   never heard another word about it.    (*Ibid.*)

8       Four other witnesses interviewed by defense investigators confirmed
9   Melissa's reputation as a liar.    Carlos Martinez, for example, told
10  investigators that he knew Melissa very well, and that she was "a liar ...
    [and] would do anything for attention." (Exhibit G., p. 1.)    According to
11  Martinez, Melissa also told him, in 1997, that she was "pregnant with twins"
12  and that the father was a "gang banger in San Francisco." (*Id.* at p. 2.)

13      Another former classmate, Lindsey Fox, and her mother Carolyn, who was
14  employed as a coordinator of drug and alcohol treatment at Mount Diablo
15  Medical Center, both described Melissa as "habitually dishonest" and
16  "manipulative".    (Exhibit H, pp. 1-2.) Carolyn added that Melissa
17  "exaggerates and tells stories to make herself seem more interesting." (*Id.*
18  at 2.)

19      Finally, Melissa's friend, Jessica Jones, told investigators in 1998
20  that Melissa liked to "manufacture drama" in her life.    (Exhibit I, at p. 1.)
21  Jones was very close to Melissa, and recalled hearing about the alleged rapes
22  around the time Melissa started going to court in 1997.    She described
23  Melissa's demeanor when she spoke about these alleged crimes as "oddly
24  detached, even casual." (*Id.* at p. 4.) She concluded that Melissa's rape
    allegations in this case were "part of a larger pattern of telling stories
25  about traumas and crises in her life." (*Ibid.*)

COMPLAINT FOR DAMAGES 42 U.S.C. 1983 DEMAND FOR JURY TRIAL - 70

1  **F.    The Polygraph Examination.**

2      Finally, attached is a report of a polygraph examination administered

3  to Mr. Balu in 2001 by a highly qualified polygraph examiner named Francis M.

4  Connolly.   (See, Exhibit J.)   Mr. Connolly was employed by the F.B.I. for

5  many years as a polygraph examiner, and during that time was entrusted with

6  conducting polygraph examinations involving issues of great importance. (*Id.*

7  at pp. 4-5.)  He has qualified in state and federal court as an expert in the

8  administration and interpretation of polygraph examinations, and has taught

the subject at the F.B.I. Academy and elsewhere. (*Ibid.*)

9

10      Mr. Connolly's written report verifies that he detected no signs of

deception when Mr. Balu stated (1) that he did not have sexual intercourse

11  with Melissa F., (2) that he did not coerce or pressure Melissa into engaging

12  in any type of sexual conduct, and (3) that he did not possess a knife at any

13  time in her presence. (*Id.* at p.3.) Although this evidence would likely have

14  been inadmissible in a jury trial of this case, the report is being submitted

15  for the court's consideration under the relaxed rules of admissibility that

16  apply to non-jury proceedings, in general, and to hearings on a petition for

17  relief under Penal Code §851.8, in particular.   (*Chagoyan*, *supra*, 107

18  Cal.App.4th 815-817.)

19      Like all of the other evidence that has been placed before this court,

20  the results of this polygraph examination point unerringly to the conclusion

21  that Mr. Balu is innocent of all of the crimes he has been charged with.

22  **IV.   Conclusion**

23      Following the preliminary examination in this case on July 10 and 11,

24  1997, the committing magistrate, Judge Arthur Mann, had the following to say

about Melissa F.'s demeanor and credibility as a witness:

25

**The Court had a great deal of problems with the credibility of the prosecuting witness. Her attitude was flippant. I don't believe she was attempting to tell the truth in most instances.**

Judge Mann was able to reach this conclusion without the benefit of most of the exculpatory evidence presented in this petition – without the diary entries and all that they reveal, without the catalog of lies told and retold by Melissa, without the information from Melissa's peers that, at least during her teenage years, she was a very specific kind of liar. The issue of probable cause may have been a close call after the preliminary hearing in this case, but it is no longer a close call. The evidence of fabrication that permeates this case overwhelms any possibility that Melissa's accusations of forcible rape and armed assault by Mr. Balu are true.

For the reasons set forth above, Mr. Balu respectfully requests that this petition for a finding of factual innocence under Penal Code §851.8 be granted.

**JS 44** (Rev. 12/07) (cand rev 1-16-08)

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. (SEE INSTRUCTIONS ON PAGE TWO OF THE FORM.)

## I. (a) PLAINTIFFS

· ARVIND BALU pro se with advisory counsel

## DEFENDANTS

Lake County, Lake County Sheriff's Department, Detective Jan Layfield, Lake County District Attorney, Former DA Stephen Hedstrom, Former AD

*ADR ECF*

**(b)** County of Residence of First Listed Plaintiff
(EXCEPT IN U.S. PLAINTIFF CASES)

County of Residence of First Listed Defendant
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE LAND INVOLVED.

**(c)** Attorney's (Firm Name, Address, and Telephone Number)

PO BOX 1401
Oakland Ca 94604

Attorneys (If Known)

## II. BASIS OF JURISDICTION (Place an "X" in One Box Only)

- [ ] 1 U.S. Government Plaintiff
- [X] 3 Federal Question (U.S. Government Not a Party)
- [ ] 2 U.S. Government Defendant
- [ ] 4 Diversity (Indicate Citizenship of Parties in Item III)

## III. CITIZENSHIP OF PRINCIPAL PARTIES (Place an "X" in One Box for Plaintiff
(For Diversity Cases Only) and One Box for Defendant)

|  | PTF | DEF |  | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | [ ] 1 | [ ] 1 | Incorporated or Principal Place of Business In This State | [ ] 4 | [ ] 4 |
| Citizen of Another State | [ ] 2 | [ ] 2 | Incorporated and Principal Place of Business In Another State | [ ] 5 | [ ] 5 |
| Citizen or Subject of a Foreign Country | [ ] 3 | [ ] 3 | Foreign Nation | [ ] 6 | [ ] 6 |

## IV. NATURE OF SUIT (Place an "X" in One Box Only)

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| [ ] 110 Insurance | **PERSONAL INJURY** / **PERSONAL INJURY** | [ ] 610 Agriculture | [ ] 422 Appeal 28 USC 158 | [ ] 400 State Reapportionment |
| [ ] 120 Marine | [ ] 310 Airplane | [ ] 362 Personal Injury— Med. Malpractice | [ ] 620 Other Food & Drug | [ ] 423 Withdrawal 28 USC 157 | [ ] 410 Antitrust |
| [ ] 130 Miller Act | [ ] 315 Airplane Product Liability | [ ] 365 Personal Injury — Product Liability | [ ] 625 Drug Related Seizure of Property 21 USC 881 | | [ ] 430 Banks and Banking |
| [ ] 140 Negotiable Instrument | [ ] 320 Assault, Libel & Slander | [ ] 368 Asbestos Personal Injury Product Liability | [ ] 630 Liquor Laws | **PROPERTY RIGHTS** | [ ] 450 Commerce |
| [ ] 150 Recovery of Overpayment & Enforcement of Judgment | [ ] 330 Federal Employers' Liability | | [ ] 640 R.R. & Truck | [ ] 820 Copyrights | [ ] 460 Deportation |
| [ ] 151 Medicare Act | [ ] 340 Marine | **PERSONAL PROPERTY** | [ ] 650 Airline Regs. | [ ] 830 Patent | [ ] 470 Racketeer Influenced and Corrupt Organizations |
| [ ] 152 Recovery of Defaulted Student Loans (Excl. Veterans) | [ ] 345 Marine Product Liability | [ ] 370 Other Fraud | [ ] 660 Occupational Safety/Health | [ ] 840 Trademark | [ ] 480 Consumer Credit |
| [ ] 153 Recovery of Overpayment of Veteran's Benefits | [ ] 350 Motor Vehicle | [ ] 371 Truth in Lending | [ ] 690 Other | | [ ] 490 Cable/Sat TV |
| [ ] 160 Stockholders' Suits | [ ] 355 Motor Vehicle Product Liability | [ ] 380 Other Personal Property Damage | **LABOR** | **SOCIAL SECURITY** | [ ] 810 Selective Service |
| [ ] 190 Other Contract | [ ] 360 Other Personal Injury | [ ] 385 Property Damage Product Liability | [ ] 710 Fair Labor Standards Act | [ ] 861 HIA (1395ff) | [ ] 850 Securities/Commodities/ Exchange |
| [ ] 195 Contract Product Liability | | | [ ] 720 Labor/Mgmt. Relations | [ ] 862 Black Lung (923) | [ ] 875 Customer Challenge 12 USC 3410 |
| [ ] 196 Franchise | | | [ ] 730 Labor/Mgmt.Reporting & Disclosure Act | [ ] 863 DIWC/DIWW (405(g)) | [ ] 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS** | **PRISONER PETITIONS** | [ ] 740 Railway Labor Act | [ ] 864 SSID Title XVI | [ ] 891 Agricultural Acts |
| [ ] 210 Land Condemnation | [ ] 441 Voting | [ ] 510 Motions to Vacate Sentence | [ ] 790 Other Labor Litigation | [ ] 865 RSI (405(g)) | [ ] 892 Economic Stabilization Act |
| [ ] 220 Foreclosure | [ ] 442 Employment | **Habeas Corpus:** | [ ] 791 Empl. Ret. Inc. Security Act | | [ ] 893 Environmental Matters |
| [ ] 230 Rent Lease & Ejectment | [ ] 443 Housing/ Accommodations | [ ] 530 General | | **FEDERAL TAX SUITS** | [ ] 894 Energy Allocation Act |
| [ ] 240 Torts to Land | [ ] 444 Welfare | [ ] 535 Death Penalty | | [ ] 870 Taxes (U.S. Plaintiff or Defendant) | [ ] 895 Freedom of Information Act |
| [ ] 245 Tort Product Liability | [ ] 445 Amer. w/Disabilities - Employment | [ ] 540 Mandamus & Other | **IMMIGRATION** | [ ] 871 IRS—Third Party 26 USC 7609 | [ ] 900 Appeal of Fee Determination Under Equal Access to Justice |
| [ ] 290 All Other Real Property | [ ] 446 Amer. w/Disabilities - Other | [ ] 550 Civil Rights | [ ] 462 Naturalization Application | | [ ] 950 Constitutionality of State Statutes |
| | [ ] 440 Other Civil Rights | [ ] 555 Prison Condition | [ ] 463 Habeas Corpus – Alien Detainee | | |
| | | | [ ] 465 Other Immigration Actions | | |

## V. ORIGIN (Place an "X" in One Box Only)

- [X] 1 Original Proceeding
- [ ] 2 Removed from State Court
- [ ] 3 Remanded from Appellate Court
- [ ] 4 Reinstated or Reopened
- [ ] 5 Transferred from another district (specify)
- [ ] 6 Multidistrict Litigation
- [ ] 7 Appeal to District Judge from Magistrate Judgment

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing (Do not cite jurisdictional statutes unless diversity):
42 usc 1983 AND 42 USC 1985
Brief description of cause:
WRONGFUL CONVICTION AND FALSE IMPRISONMENT

## VII. REQUESTED IN COMPLAINT:

- [ ] CHECK IF THIS IS A CLASS ACTION UNDER F.R.C.P. 23
- DEMAND $
- CHECK YES only if demanded in complaint:
- JURY DEMAND: [X] Yes [ ] No

## VIII. RELATED CASE(S) IF ANY

PLEASE REFER TO CIVIL L.R. 3-12 CONCERNING REQUIREMENT TO FILE "NOTICE OF RELATED CASE".

## IX. DIVISIONAL ASSIGNMENT (CIVIL L.R. 3-2)
(PLACE AND "X" IN ONE BOX ONLY)

- [ ] SAN FRANCISCO/OAKLAND
- [ ] SAN JOSE

DATE 6/18/08

SIGNATURE OF ATTORNEY OF RECORD

JS 44 Reverse (Rev. 12/97)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS 44

## Authority For Civil Cover Sheet

The JS 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

**I.** **(a) Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

(b) County of Residence. For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

(c) Attorneys. Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)".

**II.** **Jurisdiction.** The basis of jurisdiction is set forth under Rule 8(a), F.R.C.P., which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

United States plaintiff. (1) Jurisdiction based on 28 U.S.C. 1345 and 1348. Suits by agencies and officers of the United States are included here.

United States defendant. (2) When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

Federal question. (3) This refers to suits under 28 U.S.C. 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

Diversity of citizenship. (4) This refers to suits under 28 U.S.C. 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; federal question actions take precedence over diversity cases.)

**III.** **Residence (citizenship) of Principal Parties.** This section of the JS 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

**IV.** **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerks in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

**V.** **Origin.** Place an "X" in one of the seven boxes.

Original Proceedings. (1) Cases which originate in the United States district courts.

Removed from State Court. (2) Proceedings initiated in state courts may be removed to the district courts under Title 28 U.S.C., Section 1441. When the petition for removal is granted, check this box.

Remanded from Appellate Court. (3) Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

Reinstated or Reopened. (4) Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

Transferred from Another District. (5) For cases transferred under Title 28 U.S.C. Section 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

Multidistrict Litigation. (6) Check this box when a multidistrict case is transferred into the district under authority of Title 28 U.S.C. Section 1407. When this box is checked, do not check (5) above.

Appeal to District Judge from Magistrate Judgment. (7) Check this box for an appeal from a magistrate judge's decision.

**VI.** **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC 553
Brief Description: Unauthorized reception of cable service

**VII.** **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Rule 23, F.R.Cv.P.

Demand. In this space enter the dollar amount (in thousands of dollars) being demanded or indicate other demand such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

**VIII.** **Related Cases.** This section of the JS 44 is used to reference related pending cases if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.
**Date and Attorney Signature.** Date and sign the civil cover sheet.